**Bonnie CICIO, individually and as Administratrix of the Estate of Carmine Cicio, Plaintiff–Appellant,**

v.

**John DOES 1–8, Defendants,**

**Vytra Healthcare, and Brent Spears, M.D., Defendants–Appellees.**

**Docket No. 01–9248.**

United States Court of Appeals, Second Circuit.

Argued: June 20, 2002.

Decided: Feb. 11, 2003.

As Amended: March 12, 2003.

David L. Trueman, Mineola, N.Y. (Joel J. Ziegler, Greshin, Ziegler & Amicizia, LLP, of counsel, Smithtown, NY), for Plaintiff–Appellant.

Michael H. Bernstein, Sedgwick, Detert, Moran & Arnold, New York, N.Y. (Colleen A. Tan, of counsel), for Defendants–Appellees.

Eugene R. Anderson, Rhonda D. Orin, Michele A. Gallagher, Anderson Kill & Olick, L.L.P., Washington, DC, submitted a brief for Amici Curiae American Medical Association and Medical Society of the State of New York.

Miles J. Zaremski, Kamensky & Rubinstein, Lincolnwood, IL, submitted a brief for Amici Curiae American College of Legal Medicine.

Harold N. Iselin, Hank M. Greenberg, Couch White, LLP, Albany, NY, submitted a brief for Amici Curiae American Association of Health Plans and New York Health Plan Association.

Before: CALABRESI, SACK, and B.D. PARKER, Jr., Circuit Judges.

Judge CALABRESI dissents in part in a separate opinion.

SACK, Circuit Judge.

Plaintiff Bonnie Cicio appeals from an October 4, 2001 judgment of the United States District Court for the Eastern District of New York (Joanna Seybert, *Judge*) denying her motion to remand her action to New York Supreme Court, and granting the Fed.R.Civ.P. 12(b)(6) motion of the defendants Vytra Healthcare ("Vytra") and Dr. Brent Spears to dismiss the complaint for failure to state a claim upon which relief can be granted. *Cicio v. Vytra Healthcare*, 208 F.Supp.2d 288, 293 (E.D.N.Y.2001). The district court, adopting the March 13, 2001 report and recommendation of Magistrate Judge E. Thomas Boyle, *id.* at 293, held that all of the plaintiff's claims, which derive from the defendants-appellees' decision to deny the plaintiff's deceased spouse, Carmine Cicio, preauthorization for a requested medical procedure, were preempted by the Employee Retirement Income Security Act of 1974, 88 Stat. 832, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"). *Cicio*, 208 F.Supp.2d at 293. The plaintiff now appeals on the sole ground that her claims are not preempted by ERISA.

We agree with the plaintiff that the district court erred in dismissing the medical malpractice claims at this stage of the proceedings. We conclude, however, that the district court correctly dismissed the plaintiff's claims that are based on the defendants' alleged misrepresentations or alleged negligence in delaying a coverage decision with respect to Mr. Cicio's medical care. Accordingly, we affirm in part and remand in part.

## BACKGROUND

*Carmine Cicio's Illness and Treatment*

Because this case comes to us on appeal from the grant of a motion to discuss under Fed.R.Civ.P. 12(b)(6), we review the facts as they have been alleged by the plaintiff. *See, e.g., ICOM Holding, Inc. v. MCI Worldcom, Inc.*, 238 F.3d 219, 221 (2d Cir.2001). In March 1997, the plaintiff's spouse, Carmine Cicio, was diagnosed with

multiple myeloma.[1] He began chemotherapy the following month. At that time, both he and the plaintiff received health care benefits pursuant to an "Agreement for Comprehensive Health Services" (the "Plan") administered by Vytra, an "Individual Practice Association—Health Maintenance Organization."[2] The plaintiff's employer, North Fork Bank, had purchased the Plan from Vytra. The Plan, it is now undisputed, is an "employee benefit plan," as defined in 29 U.S.C. § 1002(3) of ERISA.[3]

The Plan's subscriber agreement explains that Vytra provides Plan enrollees with, *inter alia*, "[d]iagnosis and treatment of disease, injury or other conditions." Agreement for Comprehensive Health Servs. Art. III, § 3.1(b). The Plan cautions, however, that "Vytra shall provide only Medically Necessary Vytra Services ...." *Id.* Art. III, § 3.5(a). Vytra also disclaims the obligation to provide "[a]ny procedure or service which, in the judgment of Vytra's Medical Director, is experimental or is not generally recognized to be effective for a particular condition, diagnosis, or body area ...." *Id.* Art. IX, § 9.3(f).

On January 28, 1998, some ten months after Carmine Cicio's disease was first diagnosed, his treating oncologist, Dr. Edward Samuel, wrote a detailed letter to Vytra "request[ing] insurance approval for treatment of Mr. Cicio with high dose chemotherapy supported with peripheral blood stem cell transplantation, in a tandem double transplant, for a diagnosis of multiple myeloma."[4] Letter from Edward

---

1. "Multiple myeloma is the second most prevalent blood cancer and represents approximately 1% of all cancers and 2% of all cancer deaths." Multiple Myeloma Research Foundation, *The Statistics, at* http://www.multiplemyeloma.org/aboutmyeloma/statistics.html (last visited September 16, 2002).

2. An independent practice association is a "local physician group ... comprised of physicians who are active on [a] hospital's medical staff" and contract with a health maintenance organization to provide medical services. Kenneth R. Wing *et al., The Law and American Health Care* 1005–06 (1998) (citing Carl H. Hitchner et al., *Integrated Delivery Systems: A Survey of Organizational Models*, 29 Wake Forest L. Rev. 273, 275 (1994)). Health Maintenance Organizations ("HMOs") are entities that "offer a form of health insurance [that differs from traditional medical insurance] .... HMOs are not guaranteeing to *reimburse* the insured for medical expenses; rather, their obligation to the insured is more direct—to actually *provide* medical services to them." *Id.* at 77 (internal citation omitted; emphasis in original); *see also Pegram v. Herdrich*, 530 U.S. 211, 218, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) ("The defining feature of an HMO is receipt of a fixed fee for each patient enrolled under the terms of a contract to provide specified health care if needed.").

In an "Individual Practice Association—Health Maintenance Organization," "physicians' services are established with a relatively large number of generally small or medium-sized group practices, with physicians receiving some type of discounted fee-for-service payment from the HMO, rather than ... salaried reimbursement ...." *Id.* at 81 (internal citation omitted).

3. A plan within the meaning of ERISA is "a set of rules that define the rights of a beneficiary and provide for their enforcement. Rules governing collection of premiums, definition of benefits, submission of claims, and resolution of disagreements over entitlement to services are the sorts of provisions that constitute a plan." *Pegram*, 530 U.S. at 223, 120 S.Ct. 2143. Here, the "Agreement for Comprehensive Health Services" fulfills that function.

4. A peripheral blood stem cell transplantation is "[a] procedure in which blood containing mobilized stem cells is collected by apheresis [a procedure in which blood is removed from a donor, a blood component, e.g., white blood cells, is separated out, and the remaining blood is reinfused back into the donor], stored, and infused following high-dose chemotherapy or radiation therapy." Multiple Myeloma Research Foundation, *Myeloma Dic-*

T. Samuel to Vytra dated January 28, 1998, at 1. Dr. Samuel set forth Carmine Cicio's clinical history and prior treatments, including one type of chemotherapy that had failed, before explaining why "a change in strategy of treatment . . . had to be made." *Id.* And Dr. Samuel explained why he thought that Mr. Cicio was a good "candidate" for the transplant. *Id.* at 2.

Almost a month later, in a letter dated February 23, 1998, Vytra's medical director, the defendant Dr. Spears, denied Dr. Samuel's request, stating only that the procedure sought was "not a covered benefit according to this member's plan which states [that] experimental/investigational procedures are not covered." Letter from Brent W. Spears to Edward T. Samuel dated February 23, 1998, at 1. On March 4, after unsuccessful attempts to contact Dr. Spears by telephone, Dr. Samuel wrote Dr. Spears "appealing to [him] to reconsider [his] decision." Letter from Edward T. Samuel to Brent W. Spears dated March 4, 1998, at 1–2. Dr. Samuel argued that

> The treatment of multiple myeloma by high-dose chemotherapy/autologous stem cell transplantation is a well-established method of treatment with a superior response rate, complete response rate, post therapy disease-free interval, and possibly even a long-term cure in some patients, as compared to standard therapies. These facts are true for single transplant methodologies, and the statistical response rate and CR rates are improved even further with double transplants.

*Id.* He further argued, based on medical literature listed in his letter, that "treatment NOW with high-dose chemotherapy and autologous stem transplant . . . offers [Mr. Cicio] better chances of survival than

any other available method of treatment." *Id.* at 2 (emphasis in original). While this letter made the one reference to "single transplant methodologies" quoted above, it made clear that Dr. Samuel viewed that procedure as a less appropriate treatment for Mr. Cicio than a double stem cell transplant and was not requesting approval for it. *Id.* at 1.

Three weeks later, in a letter dated March 25, 1998, Dr. Spears tersely replied that "[b]ased on the clinical peer review of the additional material, [presumably the studies referenced by Dr. Samuel in his March 4 letter,] a single stem cell transplant has been approved" but "the original request for [a] tandem stem cell transplant remains denied." Letter from Brent W. Spears to Edward T. Samuel dated March 25, 1998, at 1. Mr. Cicio, who, according to the complaint, was by March 25 no longer a candidate for a stem cell transplant, died less than two months later, on May 11, 1998. Compl. ¶ 31.

*The Complaint*

Bonnie Cicio filed a complaint, on behalf of herself and the estate of her late husband, in New York Supreme Court, Suffolk County, naming Vytra, Dr. Spears, and eight unknown physicians employed by Vytra ("John Does 1–8") as defendants. The complaint contains eighteen counts alleging "medical malpractice, negligence, gross negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, misrepresentation, breach of contract, bad faith breach of insurance contract and violation of New York State law" based on Dr. Spears's denial of treatment to Mr. Cicio.

On May 30, 2000, the defendants removed the proceedings from New York

---

*tionary, at* http://www.multiplemyeloma.org/aboutmyeloma/defs.html (last visited September 16, 2002).

state court to the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1441. On June 21, 2000, they filed a Rule 12(b)(6) motion to dismiss the complaint for failure to state a claim.

*The Magistrate Judge's Report and Recommendation and the District Court's Decision*

The case was referred by the district court to Magistrate Judge E. Thomas Boyle, who (1) found that removal jurisdiction obtained, and (2) recommended that the defendants' Rule 12(b)(6) motion be granted. *Cicio*, 208 F.Supp.2d at 294–302. Magistrate Judge Boyle reasoned that the plaintiff's state law claims were preempted under §§ 502(a) and 514(a) of ERISA, 29 U.S.C. §§ 1132(a)(1)(B) & 1144(a), because the plaintiff sought "to enforce the terms of [an employee welfare benefit] plan" and that her claims were "within the scope of" § 502(a). *Cicio*, 208 F.Supp.2d at 296–301. He concluded that both removal and dismissal were therefore required. *Id.* at 302. He also recommended that the plaintiff's state law deceptive business practices claim be dismissed because it was "exceedingly vague." *Id.* at 301–02.

In so concluding, the magistrate judge rejected several counter-arguments proffered by Ms. Cicio. First, he rejected her argument that Vytra's Agreement for Comprehensive Health Services was not a "plan" governed by ERISA. *Id.* at 297. Then he declined to endorse the plaintiff's argument that her medical malpractice claims were not preempted because they concerned "mixed eligibility and treatment decisions," as described in *Pegram v. Herdrich*, 530 U.S. 211, 229, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). *Cicio*, 208 F.Supp.2d at 300–01. While many decisions by health insurance providers "involve[ ] some medical judgment," Magistrate Judge Boyle said,

"[t]here is no evidence that Congress intended that these quasi-medical/administrative decisions made by a plan administrator survive ERISA preemption." *Id.* Even if such malpractice claims were not preempted, Magistrate Judge Boyle continued, Ms. Cicio had not challenged "the quality of the care but rather ... the benefits decision that was made," and hence had alleged the kind of claim that ERISA preempted. *Id.* at 301.

The plaintiff formally objected to the magistrate judge's report and recommendation. The district court nonetheless adopted it in full. *Id.* at 291. The court agreed that Vytra's health plan was a "benefit plan" as defined by ERISA. *Id.* at 292. The court also disagreed with the renewed contention that under *Pegram*, claims for improper medical care are not preempted by ERISA. It concluded instead that because all of the plaintiff's malpractice claims "involve[d] eligibility for coverage," such that the "[d]efendants' roles, including that of Dr. Spears, were administrative," these claims concerned benefits decisions and thus were also preempted. *Id.* at 293.

The plaintiff appeals.

## DISCUSSION

### I. Standard of Review

We review a district court's denial of a motion to remand *de novo*. *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 201 (2d Cir.2001). We also review the district court's decision to grant a Rule 12(b)(6) motion *de novo*. *Kalnit v. Eichler*, 264 F.3d 131, 137–38 (2d Cir.2001). Dismissal is not warranted unless "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). We thus "tak[e] all factual alle-

gations in the [verified] complaint as true and constru[e] all reasonable inferences in favor of plaintiffs." *Conboy v. AT & T Corp.*, 241 F.3d 242, 246 (2d Cir.2001) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

## II. The Nature of the Plaintiff's Claims

Because the plaintiff asserts a variety of claims, we must first determine which of them remain on appeal. We note initially that the plaintiff's deceptive business practices claim and contract claims are no longer before us. The magistrate judge rejected the former, *see* Compl. ¶¶ 127–29, as excessively vague, *Cicio*, 208 F.Supp.2d at 301–02, a conclusion Ms. Cicio does not challenge on appeal. And in her brief to us, Ms. Cicio renounces her breach of contract claim and bad faith breach of insurance contract claim. Plaintiff–Appellant's Br. at 1. Finally, although Ms. Cicio asserts causes of action for what she calls tortious interference with the physician-patient relationship, Compl. ¶¶ 69–76, breach of fiduciary duty, *id.* ¶¶ 77–81, negligent supervision of employees, *id.* ¶¶ 103–06, and negligent and intentional infliction of emotional distress, *id.* ¶¶ 107–17, the facts underlying these theories of recovery are entirely subsumed within her other negligence claims. We therefore treat these causes of action as alternative pleadings of her remaining medical malpractice and negligence claims.

■ The claims thus remaining on appeal pertain in substance to (1) the timeliness of Dr. Spears's decisions relating to Mr. Cicio's treatment, *see* Compl. ¶¶ 58–81; (2) the allegedly misleading nature of Vytra's representations about the Plan, *see* Compl. ¶¶ 82–102; and, (3) the quality of the medical decision, if any, made by the defendants with respect to Mr. Cicio's treatment, *see* Compl. ¶¶ 33–57, 103–17.[5] Both the magistrate judge, *Cicio*, 208 F.Supp.2d at 301, and the district court, *id.*, determined that the complaint did not challenge the quality of the medical decision because "all of the Plaintiff's state law claims center on Vytra's refusal to approve coverage and thus stem from an adverse benefits determination," *id.* We disagree.

A Rule 12(b)(6) dismissal "is inappropriate unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle [her] to relief." *Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 68 (2d Cir.2000) (internal citation and quotation marks omitted). Under this broad standard, Ms. Cicio's complaint identifies a medical decision that may be the predicate for a state-law medical malpractice claim.

■ The complaint alleges that Dr. Spears and other physicians employed by Vytra "failed to exercise the degree of care required of them and were negligent in the provision and delivery of medically necessary care." Compl. ¶ 56. It is possible

---

**5.** We disagree with the defendants' suggestion that the plaintiff failed to perfect an appeal of the magistrate judge's report and recommendation. "A party must serve and file any objections to a magistrate judge's proposed findings and recommendations within ten days after being served with the report.... [F]ailure to object timely to a report waives any further judicial review of the report." *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.) (citing 28 U.S.C. § 636(b)(1)), *cert. denied*, 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992). Ms. Cicio filed her objection, that the magistrate judge's report and recommendation was "clearly erroneous," within ten days after the report was filed, hence meeting her obligation under 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(a). Our cases have mandated no further specification of the basis for objection, and we decline to require additional detail in a timely objection to a magistrate judge's report and recommendation.

that in attacking Dr. Spears's determination that a "tandem double stem cell transplant" was an "experimental/investigational procedure[ ]," Ms. Cicio is questioning only Dr. Spears's assessment of the then-current state of medical science without regard to Mr. Cicio's particular medical affliction. This kind of decision about the scope of generally available benefits lacks a significant application of medical judgment to Mr. Cicio's case and, as the district court correctly noted, would be treated as a decision simply about the scope of benefits. But correspondence between Drs. Samuel and Spears attached to the complaint, see Compl. ¶¶ 15, 19, 26 & 29, and incorporated therein by reference,[6] described above, strongly suggests that Ms. Cicio is contending additionally or in the alternative that Dr. Spears, in making negligent medical decisions about Mr. Cicio's condition, was engaged in medical malpractice. The liberal construction we are required to give the complaint requires us to consider this understanding of the allegations it contains.

In his request for approval for treatment dated January 28, 1998, Dr. Samuel provided Vytra's Medical Director, Dr. Spears, with a thorough description of the case history of Mr. Cicio's illness. Letter from Edward T. Samuel to Vytra dated January 28, 1998, at 1–3. This information at least permitted Dr. Spears to make a medical determination regarding Mr. Cicio's treatment on the basis of his aggregate symptoms. And while Dr. Spears stated in reply only that the requested "procedure is not a covered benefit according to this member's plan," Letter from Brent W. Spears to Edward T. Samuel dated February 23, 1998, at 1, his decision could have rested *either* on an analysis of the appropriate treatment for Mr. Cicio's specific condition, *or* on whether in the abstract a double stem cell transplant to treat multiple myeloma was experimental given the current state of the medical art. Therefore, there is at least a possibility that the February 23rd letter reflected a medical decision.

The impression that the February 23rd letter may have embodied a medical decision is strengthened by the subsequent correspondence. Dr. Samuel's response stressed the appropriateness of double stem cell transplants in light of Mr. Cicio's particular symptoms. Dr. Spears's answer, that "[b]ased on the clinical peer review of the additional information, a single stem cell transplant has been approved [but] the original request for tandem stem cell transplant remains denied," Letter from Brent W. Spears to Edward T. Samuel dated March 25, 1998, at 1, appears to reflect a decision about an appropriate level of care. By denying one treatment and authorizing another that Dr. Samuel had not specifically requested, Dr. Spears at least seems to have been engaged in a patient-specific prescription of an appropriate treatment, and, ultimately, a medical decision that a single stem cell transplant was the appropriate treatment for Mr. Cicio.

At this stage of the litigation, reading the plaintiff's complaint and the attachments thereto together, then, we conclude that the plaintiff has alleged that the defendants made a decision that could implicate a state law duty concerning the quality of medical decision-making, in addition to and independent of her claims concern-

---

**6.** *See* Fed.R.Civ.P. 10(c) ("Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion. A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").

ing the administration of benefits with respect to her late husband's course of care.

We do not, however, draw any conclusion about the availability of a malpractice claim in these circumstances under New York law, or whether any of the elements of such a claim, if it exists, would be satisfied by the facts as alleged in this case. We conclude only that, for the purposes of this Rule 12(b)(6) motion, the plaintiff has alleged more than an adverse benefits decision. She has also alleged that the defendants made a negligent medical determination with respect to the treatment of her late husband.

### III. Subject Matter Jurisdiction

The district court concluded that defendants' removal of the complaint to federal court was proper. We agree.

#### A. Removal Jurisdiction

Pursuant to 28 U.S.C. § 1441(b), under which this case was removed from state to federal court, "[a]ny civil action of which the [federal] district courts have original jurisdiction [under 28 U.S.C. § 1331] ... shall be removable ...." Section 1331 in turn provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

Thus, "a defendant may not remove a case to federal court [pursuant to § 1441(b)] unless the plaintiff's complaint establishes that the case 'arises under' federal law." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 10, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (emphasis omitted); *accord Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) ("It is long settled law that a cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of fed-

eral law."). But all eighteen causes of action in Ms. Cicio's complaint sound in New York, not federal, law. And while the defendants' principal defense here rests on federal preemption grounds, if "the only question for decision [was] raised by a federal preemption defense" against a state law claim, no "arising under" subject matter jurisdiction would exist. *Franchise Tax Bd.*, 463 U.S. at 12, 103 S.Ct. 2841. Removal to federal district court would, in such circumstances, be improper.

■ Ms. Cicio's complaint may nonetheless establish § 1331 subject matter jurisdiction pursuant to federal courts' ability to "recharacterize a state law complaint" as "arising under" federal law, *Taylor*, 481 U.S. at 64, 107 S.Ct. 1542, under the "complete preemption" doctrine of jurisdiction. "[W]hen Congress mandates 'complete preemption' in a specific area of the law, any civil complaint raising a state law claim in that area is of necessity so federal in character that it arises under federal law ... and permits removal to federal court under 28 U.S.C. § 1441." *Plumbing Indus. Bd. v. E.W. Howell Co.*, 126 F.3d 61, 66 (2d Cir.1997). Complete preemption prevents plaintiffs from "deny[ing] a defendant access to federal court if the actual nature of the complaint is federal, by artfully pleading a complaint" as including solely state law claims. *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1488 (7th Cir.1996) (internal citation and punctuation omitted). We turn first to consider the complete preemption doctrine and then apply it to the circumstances of the case at bar.

#### B. Complete Preemption and ERISA

■ Complete preemption with respect to ERISA, and consequently "arising under" subject matter jurisdiction after removal from state court, has two prerequisites. "[A] state-law cause of action arises

under federal law within the meaning of 28 U.S.C. § 1331, and is removable under 28 U.S.C. § 1441, if (1) the cause of action is based on a state law that is preempted by ERISA [so-called 'conflict' or 'substantive' preemption], and (2) the cause of action is 'within the scope of the civil enforcement provisions' of ERISA § 502(a), 29 U.S.C. § 1132(a)." *Romney v. Lin,* 94 F.3d 74, 78 (2d Cir.1996) ("*Romney I*") (internal citation omitted), *reh'g denied,* 105 F.3d 806 (2d Cir.) ("*Romney II*"), *cert. denied.,* 522 U.S. 906, 118 S.Ct. 263, 139 L.Ed.2d 189 (1997); *accord Marcella v. Capital Dist. Physicians' Health Plan, Inc.,* 293 F.3d 42, 46 (2d Cir.2002).

■ *1. "Conflict" Preemption.* To satisfy the first part of the test for complete preemption, state law claims must be subject to "conflict" (or "substantive") preemption by ERISA.[7] Section 514(a) of ERISA provides that ERISA "supersede[s] any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan described in section 1003(a) of this title," with exceptions not relevant here. 29 U.S.C. § 1144(a) (emphasis added); *cf. id.* § 1002(1) (defining "employee welfare benefit plan" to include "any plan, fund, or program . . . established or maintained by an employer or by an employee organization . . . for the purpose of providing for its participants or their beneficiaries . . . medical, surgical, or hospital care or benefits"). "[A] state law relates to an ERISA plan 'if it has a connection with or reference to such a plan.'" *Egelhoff v. Egelhoff,* 532 U.S. 141, 147, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001) (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)).

Glossing the "reference to" language of *Shaw,* the Supreme Court has explained that "[w]here a State's law acts immediately and exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to the law's operation . . . that 'reference' will result in pre-emption." *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr. N.A.,* 519 U.S. 316, 325, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) (internal citations omitted). We find no such reference here. Because the state laws invoked by Ms. Cicio, such as that respecting medical malpractice doctrine, act neither immediately nor exclusively on ERISA plans and because such plans are not "essential to" the laws' operation, we need consider this question no further.

■ But a state law is also conflict preempted if it has a "connection with" an ERISA plan. *Egelhoff,* 532 U.S. at 147, 121 S.Ct. 1322. The requisite connection exists if a law "mandates employee benefit structures or their administration or provides alternative enforcement mechanisms [to ERISA]." *Plumbing Indus. Bd.,* 126 F.3d at 67 (quoting *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 658, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995); internal punctuation omitted); *accord HMI Mech. Sys., Inc. v. McGowan,* 266 F.3d 142, 149 (2d Cir.2001). In this analysis, a court "look[s] both to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive as well as to the nature of the effect of the state law on ERISA plans." *Dillingham Constr.,* 519 U.S. at 325, 117 S.Ct. 832 (internal citations and punctuation omitted). Complete preemption in the case at hand, if it exists, must

**7.** "Conflict" preemption arises when federal law's constitutionally mandated supremacy over state law requires that federal law displace conflicting state law as a rule of decision. *See Darcangelo v. Verizon Communications, Inc.,* 292 F.3d 181, 186–87 (4th Cir. 2002).

therefore rest on the "connection with" theory.

2. *"Within the scope of"* the civil enforcement provisions of ERISA. Conflict preemption "alone is insufficient to support removal jurisdiction." *Romney I,* 94 F.3d at 78. As noted above, a state law action preempted by ERISA establishes "arising under" jurisdiction only if, under the second part of the complete preemption test, it is *also* a "cause[ ] of action within the scope of the civil enforcement provisions of [ERISA] § 502(a)." *Taylor,* 481 U.S. at 66, 107 S.Ct. 1542 (emphasis added); *accord Plumbing Indus. Bd.,* 126 F.3d at 69; *Romney II,* 105 F.3d at 812–13.

Section 502(a)(1)(B) of ERISA provides for actions "to recover benefits due ... under the terms of [a] plan, to enforce ... rights under the terms of the plan, or to clarify ... rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Congress thereby created "a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 54, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). "In enacting §§ 502(a) and 514(a), Congress sought to eliminate alternative state law remedies for benefit plan participants and beneficiaries, relegating such persons to ... six well-integrated remedies ...." *Plumbing Indus. Bd.,* 126 F.3d at 68; *see also Mass. Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 146, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) (describing ERISA's "interlocking, interrelated, and interdependent remedial scheme").

The second component of the complete preemption test is met if state law causes of action that are pleaded seek to vindicate rights already protected by § 502(a). These claims are then recharacterized as federal in nature and serve as a basis for "arising under" subject matter jurisdiction. A cause of action is therefore "within the scope of" § 502(a) "only if ... [it] is properly characterized as seeking 'to recover benefits due to [the plaintiff] under the terms of [the] plan, to enforce his [or her] rights under the terms of the plan, or to clarify his [or her] rights to future benefits under the terms of the plan.'" *Lupo v. Human Affairs Int'l, Inc.,* 28 F.3d 269, 272 (2d Cir.1994) (quoting 29 U.S.C. § 1132(a)(1)(B)). But "[a] suit need not be a cognizable, winning claim under § 502(a) in order to fall 'within the scope' of the provision for purposes of the jurisdiction analysis." *Plumbing Indus. Bd.,* 126 F.3d at 69. Any "state cause of action that acts as an alternative means of vindicating the rights protected by § 502(a) is 'within the scope' of the section even if the suit is directed against a defendant not liable under ERISA." *Id.* Jurisdiction exists, then, even over *unsuccessful* attempts to circumvent § 502(a).

With these two prerequisites of complete preemption in mind, we turn to consider whether there is complete preemption of the plaintiff's timeliness and misrepresentation claims so as to permit their removal.

*C.   Removal Jurisdiction over the Timeliness and Misrepresentation Claims*

■ 1. *The Timeliness Claims.* The plaintiff's timeliness claims rest on "the defendants' [alleged] failure to conduct an appeal of their denial of care ... in a timely fashion ...." Compl. ¶ 66. The plaintiff specifically alleges negligence in defendants' failure to respond promptly to Dr. Samuel's January 28, 1998 request. Her claim draws on New York law to the effect that "a determination involving con-

tinued or extended health care services, or additional services for an enrollee undergoing a course of continued treatment," must be made and communicated "by telephone and in writing within one business day of receipt of the necessary information." N.Y. Pub. Health Law § 4903(3); *see also* Compl. ¶ 24; Plaintiff–Appellant's Br. at 2. We conclude that such claims are conflict preempted by § 514. We also conclude that the timeliness claims are "within the scope of" § 502(a). Removal jurisdiction therefore properly obtains over them.

First, with regard to conflict preemption, ERISA already mandates that employee benefit plans "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied." 29 U.S.C. § 1133(1). Regulations issued by the Secretary of Labor pursuant to 29 U.S.C. § 1135 "set[ ] forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries." 29 C.F.R. § 2560.503–1(a). A request "to extend the course of treatment beyond the period of time or number of treatments that is a claim involving urgent care shall be decided as soon as possible . . . and the plan administrator shall notify the claimant . . . within 24 hours after receipt of the claim by the plan . . .," *id.* § 2560.503–1(f)(2)(ii)(B). Otherwise, a plan adminis-

trator must generally act within ninety days, *id.* § 2560.503–1(f)(1).

The New York law that plaintiff attempts to enforce thus has an "effect on the primary administrative functions of benefit plans," *Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 146 (2d Cir.), *cert. denied*, 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989), and conflicts with regulations established pursuant to ERISA. By requiring that health benefits plans reply to requests for "additional services for . . . continued treatment" within twenty-four hours, N.Y. Pub. Health Law § 4903(3), New York law establishes a different rule from ERISA's, which requires action within the same time-frame only if a claim involves continuing "urgent care," 29 C.F.R. § 2560.503–1(f)(2)(ii)(B).[8]

The second part of the test for complete preemption—that the cause of action be "within the scope of" § 502(a)—is also satisfied because the plaintiff's timeliness claims are "an alternative mechanism . . . for enforcing the rights protected by ERISA." *Plumbing Indus. Bd.*, 126 F.3d at 68. Under § 502(a)(1), a participant or beneficiary of a plan may file suit "to enforce his [or her] rights under the terms of the plan." 29 U.S.C. § 1132(a)(1)(A). And an enrollee in an ERISA-governed plan has a right to timely determinations. *See* 29 C.F.R. § 2560.503–1(f)(2)(ii)(B).

---

**8.** In reaching this conclusion, we tread a well-worn path. "[C]ommon law causes of action . . . based on alleged improper processing of a claim for benefits under an employee benefit plan, undoubtedly meet the criteria for pre-emption under § 514(a)." *Pilot Life*, 481 U.S. at 48, 107 S.Ct. 1549. In light of *Pilot Life's* conclusion, circuit courts have uniformly concluded that tort claims of negligence based solely on delay in processing are preempted. *See, e.g., Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266, 273 (3d Cir. 2001) (preempting "a claim that the HMO or plan administrator delayed"); *Bast v. Prudential Ins. Co. of Am.*, 150 F.3d 1003, 1007–08

(9th Cir.1998) (rejecting a state law wrongful death suit based on improper processing of a claim), *cert. denied*, 528 U.S. 870, 120 S.Ct. 170, 145 L.Ed.2d 144 (1999); *Cannon v. Group Health Serv. of Okla., Inc.*, 77 F.3d 1270, 1273–74 (10th Cir.) (preempting a claim of negligence in approving treatment), *cert. denied*, 519 U.S. 816, 117 S.Ct. 66, 136 L.Ed.2d 27 (1996); *Spain v. Aetna Life Ins. Co.*, 11 F.3d 129, 131–32 (9th Cir.1993) (preempting a wrongful death action based on failure to approve treatment in a timely fashion), *cert. denied*, 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 340 (1994).

The Cicios could thus have brought suit for injunctive relief under § 502(a)(1)(B) in February or March 1998 to seek to obtain authorization for the double stem cell transplant. An attempt to vindicate the same interest through a state law mechanism is an action "within the scope of" § 502(a), *Taylor*, 481 U.S. at 66, 107 S.Ct. 1542.

The timeliness claims therefore meet the second prerequisite to complete preemption. Removal jurisdiction with respect to them is thus established.

■ 2. *The Misrepresentation Claims.* The plaintiff also alleges that Vytra "intentionally withheld information from its customers regarding defendants' intention to interpret its policies in a manner inconsistent with, and contrary to, its own understanding of the policies' provisions" before the Cicios accepted coverage, and upon execution of the Plan, "adopted inconsistent and incorrect interpretations of the term 'medical necessity' and other terms contained in the Policy." Compl. ¶¶ 83, 90. These claims, too, are subject to complete preemption.

First, "ERISA preempts state common law claims of fraudulent or negligent misrepresentation when the false representations concern the existence or extent of benefits under an employee benefit plan." *Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 378 (4th Cir.2001). In other words, the cause of action that the plaintiff's misrepresentation claims rely upon is conflict preempted.

Second, the misrepresentation claims rest on the allegation that Vytra had an obligation under the terms of the plan to provide benefits that it failed to provide. The claims thus seek to vindicate rights accruing under the plan. But ERISA § 502(a)(1)(B) allows recovery of "benefits due ... under the terms of [a] plan." 29 U.S.C. § 1132(a)(1)(B). And we have previously rejected similar state law claims—to the effect that a plan administrator misrepresented the availability of benefits under a plan—as "attempt[s] to supplement the plan's express provisions and secure an additional benefit." *Smith v. Dunham–Bush, Inc.*, 959 F.2d 6, 10 (2d Cir.1992); *see also Carlo v. Reed Rolled Thread Die Co.*, 49 F.3d 790, 793–94 (1st Cir.1995) (concluding that a negligent misrepresentation claim was preempted because it sought allegedly promised plan benefits as damages).[9] As an alternative means of enforcing plan-related rights created by ERISA, the misrepresentation claims are then also "within the scope of

---

9. The complaint might be read to reference representations made before the Cicios entered the contract, and some courts have concluded that a misrepresentation claim based on actions before a contract has been signed are not preempted. *See, e.g., Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 880–81 (7th Cir. 2001). But the misrepresentations in *Neuma* concerned the value of the benefits package as a whole, not whether the package contained specific benefits. *See id.* at 869. The misrepresentation claim in *Neuma*, unlike those made by Ms. Cicio, did not require an interpretation of the terms of the plan.

In other cases concerning alleged misrepresentations made before a plan contract commenced, courts have found state law claims preempted because the claims seek, in essence, to vindicate contractual rights. *See Hall v. Blue Cross/Blue Shield of Ala.*, 134 F.3d 1063, 1065 (11th Cir.) (preempting a state law claim based on alleged fraudulent marketing because "no court will be able to determine whether [the plaintiff] has been fraudulently induced without resorting to the written policy") (emphasis in original omitted), *reh'g en banc denied*, 158 F.3d 590 (11th Cir.1998); *Degnan v. Publicker Indus., Inc.*, 83 F.3d 27, 30 (1st Cir.1996) (rejecting as preempted a claim of misrepresentation). The misrepresentation claims in the case at bar are more akin to the latter than those alleged in *Neuma* insofar as they seek to recover benefits allegedly due under the plan.

§ 502(a)," *Taylor*, 481 U.S. at 66, 107 S.Ct. 1542.

Both prerequisites for complete preemption are satisfied, so removal jurisdiction was properly exercised by the district court over the misrepresentation claims too.

### D. Supplemental Jurisdiction

■■■■ Under 28 U.S.C. § 1367(a), a district court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy" once original jurisdiction is established. *Id.* A state law claim forms part of the same controversy if it and the federal claim "derive from a common nucleus of operative fact." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)); *see also Gibbs*, 383 U.S. at 725, 86 S.Ct. 1130 ("[I]f, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.") (emphasis in original).

All Ms. Cicio's claims "derive from a common nucleus of operative fact," *Gibbs*, 383 U.S. at 725, 86 S.Ct. 1130, to wit, the denial by Dr. Spears of authorization for a double stem cell transplant. All relevant events allegedly transpired between January 28, 1998, when Dr. Samuel first requested the double stem cell transplant, and May 11, 1998, when Mr. Cicio died. The plaintiff "would ordinarily be expected to try [ ] all [of her claims] in one judicial proceeding." *Id.* Subject matter jurisdiction thus exists over Ms. Cicio's malprac-

tice claims under 28 U.S.C. § 1367(a), irrespective of whether, standing alone, they are removable.

### IV. Dismissal of the Timeliness and Misrepresentation Claims

■■■ After determining that the entire complaint was properly removable so that subject matter jurisdiction obtained, the magistrate judge and district court determined that the defendants' Rule 12(b)(6) motion should be granted because the plaintiff's asserted causes of action were all preempted by ERISA. *Cicio*, 208 F.Supp.2d at 293, 302. The preceding jurisdictional analysis, in addition to establishing that removal was appropriate, demonstrates that dismissal of the timeliness and misrepresentation claims was appropriate.

As discussed above, the timeliness and misrepresentation claims brought under New York state law are both "alternative mechanism[s] . . . for enforcing the rights protected by ERISA." *Plumbing Indus. Bd.*, 126 F.3d at 68. For that reason, they are conflict preempted by ERISA because they attempt to regulate in an area where Congress, through ERISA, has swept away all state regulation. In the preemptive shadow of ERISA, no state cause of action can lie, *cf. id.* at 68–70 (dismissing state law claims for similar reasons), and therefore these claims were rightly dismissed. All that remains for our consideration, then, are the medical malpractice claims.

### V. Preemption of Medical Malpractice Claims

■■■ The question whether a state law medical malpractice claim brought with respect to a medical decision made in the course of prospective utilization review by a managed care organization or health insurer is preempted under ERISA § 514,

and therefore beyond the reach of state tort law, is one of first impression in this Circuit. We conclude, largely on the basis of recent Supreme Court decisions, that such a state law claim is not preempted.

### A. The Practice of Utilization Review

The plaintiff's medical malpractice claims are based on Dr. Spears's denial of coverage for a double stem cell transplant for Mr. Cicio. Letter from Brent W. Spears to Edward T. Samuel dated February 23, 1998, at 1. Dr. Spears's decision occurred in the course of Dr. Samuel's attempt to obtain authorization for the double stem cell transplant from Vytra. Compl. ¶¶ 15, 19–21. The complaint then details a process of utilization review, and it is the nature of this procedure, and its relation to ERISA, upon which we now focus.

Utilization review usually involves "prospective review by a third party of the necessity of medical care." *Corcoran v. United HealthCare, Inc.*, 965 F.2d 1321, 1326 (5th Cir.), *cert. denied*, 506 U.S. 1033, 113 S.Ct. 812, 121 L.Ed.2d 684 (1992); *see also Pegram*, 530 U.S. at 219, 120 S.Ct. 2143.[10] "[T]he typical prospective review system requires some form of pre-admission certification by a third party," *Corcoran*, 965 F.2d at 1327, such as Vytra's Medical Director, Dr. Spears. "Although prospective utilization review involves no traditional face-to-face clinical encounter, it is still quasi-medical in nature. It necessarily involves evaluation of data collected in such an encounter." *Danca v. Private Health Care Sys., Inc.*, 185 F.3d 1, 5 n. 5 (1st Cir.1999); *see also Corcoran*, 965 F.2d at 1331 (characterizing utilization re-

view as a medical decision); Note, Jonathan J. Frankel, *Medical Malpractice Law and Health Care Cost Containment: Lessons for Reformers from the Clash of Cultures*, 103 Yale L.J. 1297, 1318 (1994) ("Cost-containment programs ... redistribute what we normally consider 'medical authority' to nontraditional actors."). Prospective utilization review blurs boundaries between the traditionally "distinct sphere of professional dominance and autonomy" of the medical profession on the one hand, Paul Starr, *The Social Transformation of American Medicine* 27 (1982), and the managerial domain on the other. As such, it represents a development apparently unforeseen at the time of ERISA's enactment. *See* Jeffrey E. Shuren, *Legal Accountability for Utilization Review in ERISA Health Plans*, 77 N.C. L. Rev. 731, 733 (1999).

Moreover, as other courts have noted, "a system of prospective decisionmaking influences the beneficiary's choice among treatment options to a far greater degree than does the theoretical risk of disallowance of a claim facing a beneficiary in a retrospective system." *Corcoran*, 965 F.2d at 1332; *accord Danca*, 185 F.3d at 5 n. 5. And, "[i]n many instances, a denial of coverage results in the patient forgoing the procedure altogether." J. Scott Andresen, *Is Utilization Review the Practice of Medicine?*, 19 J. Legal Med. 431, 432 (1998). Thus, decisions with a medical component—i.e., involving the exercise of medical judgment in relation to a particular patient's symptoms—are made in the course of utilization review by staff who are independent of and separate from the

---

**10.** The term "utilization review" is also applied in some federal statutes. For example, the determination by a hospital or skilled nursing care facility that an admission or continued stay is or is not medically necessary in connection with the availability of Medi-

care coverage is made by a "utilization review committee" established under the dictates of the Social Security law. *See Kraemer v. Heckler*, 737 F.2d 214, 214–16 (2d Cir.1984) (describing Medicare procedures under 42 U.S.C. § 1395x and 42 C.F.R. § 405.1035).

locus of traditional medical decision-making authority. These medical decisions have possibly dispositive consequences for the course of treatment that a patient ultimately follows.

## B. ERISA's Preemptive Scope

The Supreme Court, in its early pronouncements on ERISA preemption, suggested that the sweeping reference to "any and all State laws [that] ... relate" to benefits plans in ERISA's preemption provision, 29 U.S.C. § 1144(a), entailed an expansive preemptive effect that corresponded to the provision's broad wording. *See Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 138, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990); *Pilot Life,* 481 U.S. at 47, 107 S.Ct. 1549; *Russell,* 473 U.S. at 146–47, 105 S.Ct. 3085; *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). Since then, however, the Court has "temper[ed] the assumption that the ordinary meaning [of § 514] ... accurately expresses the legislative purpose ... with the qualification that the historic police powers of the States were not meant to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rush Prudential HMO, Inc. v. Moran,* 536 U.S. 355, 122 S.Ct. 2151, 2159, 153 L.Ed.2d 375 (2002) (internal citations and punctuation omitted). In recent discussions of ERISA preemption, it has even been hinted that "the criteria set forth in [early cases like *Shaw* and its progeny] have in effect been abandoned." *Dillingham Constr.,* 519 U.S. at 335, 117 S.Ct. 832 (Scalia, J., concurring).

Specifically, the Supreme Court has rejected the notion that any finely filigreed connection between ERISA and a state law establish ERISA preemption, and, instead, has held that a court must begin with the presumption that "in the field of health care, a subject of traditional state regulation, there is no ERISA preemption without clear manifestations of congressional purpose." *Pegram,* 530 U.S. at 237, 120 S.Ct. 2143; *accord Rush Prudential,* 122 S.Ct. at 2171; *see also De Buono v. NYSA–ILA Med. & Clinical Servs. Fund,* 520 U.S. 806, 813–14, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997) (applying a presumption that "Congress does not intend to supplant state law"; internal citation omitted); *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) (same). Moving beyond presumptions, the Supreme Court has also, in its own words, thrown "cold water" on the idea that state regulation of health and safety is necessarily preempted even when it overlaps with rights protected by ERISA. *Pegram,* 530 U.S. at 237, 120 S.Ct. 2143 (citing *Travelers,* 514 U.S. at 654–55, 115 S.Ct. 1671).

In deciding the preemption question, it is also noteworthy that ERISA's "repeatedly emphasized purpose [is] to protect *contractually* defined benefits." *Russell,* 473 U.S. at 148, 105 S.Ct. 3085 (emphasis added); *accord Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 113, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (reiterating the focus on "contractually defined benefits") (internal citation omitted); *Russell,* 473 U.S. at 147, 105 S.Ct. 3085 (noting the centrality of "contractually authorized benefits"). Indeed, one of ERISA's stated goals involves increasing "the likelihood that full benefits will be paid to participants and beneficiaries of [covered] plans." 29 U.S.C. § 1001b(b)(1). State medical malpractice law, by contrast, even if implicated by the execution of a benefits decision, involves the application of duties of conduct that are de-

fined independent of ERISA plans.[11] As such, it is not among the "rights and expectations brought into being by [ERISA]," *Ingersoll–Rand*, 498 U.S. at 137, 111 S.Ct. 478 (internal citation omitted), that § 502(a) is designed to protect.

We must therefore ask whether the plaintiff's medical malpractice causes of action "relate to" the benefits plan administered by Vytra, keeping in mind both the Supreme Court's warning that state law regulation of medical practice is not to be lightly disturbed, and the observation that ERISA's primary focus is the protection of contractual rights defined by benefits plans.

### C. The Preemption of Medical Malpractice Claims Against Utilization Review Decisions

1. *Pegram v. Herdrich.* At first blush, the defendants' contention that Dr. Spears's decision concerned a benefits determination about what medical treatments Mr. Cicio could receive pursuant to the plan, a decision that can only be challenged in a § 502(a)(1)(B) action, has considerable force. Other courts addressing similar facts have concluded that malpractice claims based on utilization review decisions are indeed preempted by § 514. They have reasoned, first, that utilization review involves "medical decisions as part and parcel of [a plan's] mandate to decide what benefits are available," and then held that, as benefits decisions, utilization review decisions can be challenged only in a § 502(a)(1)(B) action. *Corcoran*, 965 F.2d at 1332; *see also Jass*, 88 F.3d at 1489–90 (holding preempted a negligence action against a utilization review agent); *Tolton v. Am. Biodyne, Inc.*, 48 F.3d 937, 942 (6th Cir.1995) (rejecting as preempted a malpractice claim against a utilization review decision because the defendants "were determining what benefits were available ... under the plan"); *Brandon v. Aetna Servs., Inc.*, 46 F.Supp.2d 110, 113–14 (D.Conn.1999) (similar); *cf. Corporate Health Ins., Inc. v. Tex. Dep't of Ins.*, 215 F.3d 526, 534 (5th Cir.) ("ERISA preempts malpractice suits against doctors making coverage decisions in the administration of a plan ...."), *reh'g in banc denied*, 220 F.3d 641 (5th Cir.2000), *vacated and remanded on other grounds sub nom. Montemayor v. Corporate Health Ins.*, 536 U.S. 935, 122 S.Ct. 2617, 153 L.Ed.2d 800 (2002); *Rice v. Panchal*, 65 F.3d 637, 644 (7th Cir.1995) (holding that "where the state law has the effect of creating a qualitative standard ... by which the performance of the contract is evaluated, then that state law is completely preempted"). These cases rest on the proposition that a decision cannot be the basis of a malpractice claim even if it involves the exercise of medical judgment if at the same time it has a benefits determination component. According to these cases, the performance of contractual interpretation in order to determine benefits triggers preemption without regard to the medical content of a decision.

But *Corcoran*, *Jass*, and *Tolton* were decided before the Supreme Court's recent retrenchment of ERISA preemption's margins, and before the Court, in its unanimous decision in *Pegram v. Herdrich*, addressed (albeit in dicta) medical malpractice actions against those engaged in medical decision making.

*Pegram* concerned a defendant physician who "decided (wrongly, as it turned

---

11. Even if, absent a benefits contract, no medical care would in fact have been furnished, so that the medical judgment in one sense is a "benefit" and a direct consequence of the exercise of a contractual right, the state law obligation to provide care of a given level of quality when providing care is nonetheless distinct from the contract.

out) that [the plaintiff's] condition did not warrant immediate action; the consequence of that medical determination was that [the defendant HMO] would not cover immediate care, whereas it would have done so if [the defendant physician] had made the proper diagnosis and judgment to treat."[12]   530 U.S. at 229, 120 S.Ct. 2143. *Pegram* addressed only whether an HMO had, by its method of sharing profits with doctors, breached its fiduciary duty to members, disclaiming any suggestion that it was addressing the interaction between § 502 and state law claims.  530 U.S. at 229 n. 9, 120 S.Ct. 2143. *Pegram* is nonetheless relevant to the case at hand because of the reasoning upon which the Court's conclusion was based.  The Court decided that no fiduciary breach action could be brought under ERISA because, in part, such an action would be a "mere replication of state malpractice actions with HMO defendants," *id.* at 236, 120 S.Ct. 2143.  The creation of a fiduciary breach action through "the formulaic addition of an allegation of financial incentive [to a malpractice claim] would do nothing but bring the same claim into a federal court under federal-question jurisdiction." *Id.* at 235, 120 S.Ct. 2143.  We thus infer that the continued availability of some state law malpractice actions based on at least some varieties of utilization review decisions was a predicate of the Court's holding.

But the *Pegram* opinion has further ramifications for our analysis because of its detailed description and analysis of decision-making in the context of health care provision.  The Court categorized the defendant Dr. Pegram's act as a "mixed eligibility and treatment" decision, i.e., an "eligibility decision [that] cannot be untangled from physicians' judgments about reasonable medical treatment."  *Id.* at 229, 120 S.Ct. 2143.   The *Pegram* Court then explained:

What we will call pure "eligibility decisions" turn on the plan's coverage of a particular condition or medical procedure for its treatment.  "Treatment decisions," by contrast, are choices about how to go about diagnosing and treating a patient's condition: *given a patient's constellation of symptoms, what is the appropriate medical response?*

These decisions are often practically inextricable from one another . . . . This is so *not merely because,* under a scheme like [the benefits plan in *Pegram*], *treatment and eligibility decisions are made by the same person, the treating physician.  It is so because a great many and possibly most coverage questions are not simple yes-or-no questions,* like whether appendicitis is a covered condition (when there is no dispute that a patient has appendicitis), or whether acupuncture is a covered procedure for pain relief (when the claim of pain is unchallenged).  The more common coverage question is a when-and-how question.  Although coverage for many conditions will be clear and various treatment options will be indisputably compensable, physicians still must decide what to do in particular cases.  The issue may be, say, whether one treatment option is so superior to another under the circumstances, and needed so promptly, that a decision to proceed with it would meet the medical necessity requirement that conditions the HMO's

---

**12.** A patient, the plaintiff Cynthia Herdrich, had experienced pain in her groin, and submitted to an examination by Dr. Pegram. 530 U.S. at 215, 120 S.Ct. 2143.  Despite discovering a significant inflamed mass in Herdrich's abdomen, Dr. Pegram did not order an immediate diagnostic ultrasound.  *Id.* Before Herdrich was to have received the ultrasound, her appendix ruptured.  *Id.*

102

obligation to provide *or pay for* that particular procedure at that time in that case.

*Id.* at 228–29, 120 S.Ct. 2143 (citations omitted; emphasis added).

*Pegram* thus suggests that some decisions involve interpretation of a benefits contract, eligibility decisions, and some involve application of medical judgment to a particular patient's condition, treatment decisions. And these two categories overlap. The resulting third category, described in *Pegram*, of "mixed eligibility and treatment decisions," *id.* at 229, 120 S.Ct. 2143, is not limited to decisions made by treating physicians, such as Dr. Pegram, who both assess which benefits a plan provides and make treatment decisions. A decision about who will "pay for" a procedure, even when this decision is not made by a "treating physician," is also a "mixed eligibility and treatment decision" if it involves answering the question: "given a patient's constellation of symptoms, what is the [most] appropriate medical response?" *Id.* at 228–29, 120 S.Ct. 2143. In other words, even if a physician does not directly control, direct, or influence a plaintiff's treatment, and even if the sole consequence of a physician's decision is reimbursement or its denial, that decision may nonetheless be a mixed eligibility and treatment decision like Dr. Pegram's. *Id.*

*Pegram* thus alters the framework used in *Corcoran, Jass,* and *Tolton,* in which a decision must be about either "treatment" or "eligibility," and in which any element of benefits determination suffices to make a decision an "eligibility" decision that may only be challenged in a § 502(a) action. The *Pegram* court's analysis suggests instead that courts should recognize that "[i]n recent years, the medical profession's monopoly on the authority to define appropriate health care outcomes for society has been severely eroded." Frankel, *supra,* at 1320; *see also* Starr, *supra,* at 27 (describing threats to physician autonomy). The "separation between professional providers and lay financiers," which *Corcoran, Jass,* and *Tolton* presumed, "no longer exists." Frankel, *supra,* at 1320; *cf.* Starr, *supra,* at 447 (observing "increasing corporate [as opposed to professional] influence over the rules and standards of medical care"); Shuren, *supra,* at 748 (noting that utilization review agents "interpos[e] themselves into medical decisionmaking"). Decisions now regularly made by third-party payers, such as "whether one treatment option is so superior to another under the circumstances, and needed so promptly, that a decision to proceed with it would meet the medical necessity requirement" in a health benefits contract, "cannot be untangled from physicians' judgments about reasonable medical treatment," *Pegram,* 530 U.S. at 229, 120 S.Ct. 2143. And such coverage decisions based on medical determinations often have an outcome-determinative effect. *See Corcoran,* 965 F.2d at 1332; *Danca,* 185 F.3d at 5 n. 5; Andresen, *supra,* at 432. Among such decisions, noted the *Pegram* Court, are ones concerning "the experimental character of a proposed course of treatment." *Pegram,* 530 U.S. at 229–30, 120 S.Ct. 2143.

The defendants' decision in this case, in the current procedural posture of this appeal, must be treated as a mixed decision because it allegedly involved both an exercise of medical judgment and an element of contract interpretation.

■ *2. Applying Pegram's Tripartite Analysis to ERISA Preemption.* We conclude that a state law malpractice action, if based on a "mixed eligibility and treatment decision," is not subject to ERISA preemption when that state law cause of action challenges an allegedly flawed medical judgment as applied to a particular patient's symptoms. We reach this con-

clusion by applying the presumptions previously discussed, our understanding of congressional intent in enacting ERISA, and the analytic framework established in *Pegram*.

At the threshold, we decline to adopt the categorical distinction between "quality of care" decisions and "benefits administration" questions applied by other courts in the ERISA preemption context, *Pryzbowski*, 245 F.3d at 279, and by the district court in the case at bar, *Cicio*, 208 F.Supp.2d at 293. To frame the issue in that fashion is to ignore the nature of "countless medical administrative decisions every day" in which "the eligibility decision and the treatment decision [are] inextricably mixed." *Pegram*, 530 U.S. at 229, 120 S.Ct. 2143. *Pegram* teaches that this dichotomy is no longer tenable.[13]

Further, *Pegram* demonstrates that the mere presence of an administrative component in a health care decision no longer has determinative significance for purposes of preemption analysis when the decision also has a medical component. In its brief discussion of the "puzzling issue of preemption," the *Pegram* Court rejected one of the plaintiff's arguments as "a prescription for preemption of state malpractice law." *Id.* at 236, 120 S.Ct. 2143. The Court said, as we have noted, that previous cases had already thrown "cold water on the preemption theory [with regard to state law malpractice claims]." *Id.* at 237, 120 S.Ct. 2143. The Court's analysis

strongly suggests, without holding, that the plaintiff's malpractice action against Dr. Pegram would not be preempted even though Dr. Pegram simultaneously made a contractual interpretation concerning Herdrich's eligibility for given benefits, and that a defendant can no longer simply point to the overlay of medical decision-making on contractual claims and ask the court to conclude that, because ERISA preempts the contract claims, it also preempts all state tort-law claims based on the same decision.

As we have explained, nothing in ERISA suggests that Congress intended any displacement of "the quintessentially state-law standards of reasonable medical care" as applied to the medical component of a mixed decision. *Rush Prudential*, 122 S.Ct. at 2171. And ERISA requires that we distinguish between "contractually defined benefits," *Russell*, 473 U.S. at 148, 105 S.Ct. 3085, and those rights that state law delimits independent of benefits plans, such as medical quality standards, which hinge instead on statutory and common law development of malpractice law unique to each state.

Finally, we note our skepticism of a line of reasoning that would draw from "a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans," *Shaw*, 463 U.S. at 90, 103 S.Ct. 2890, the elimination of protective standards of professional

---

**13.** We think that Judge Calabresi, in his partial dissent, fails sufficiently to take into account the shift in the legal and medical landscape clearly marked by the unanimous *Pegram* decision. The question is no longer an either/or between eligibility and treatment—whether, as Judge Calabresi phrases it, the plaintiff's action is "essentially [a suit] against an insurance provider for negligently failing to give the coverage contracted for, or … against a medical care provider for

negligent failure to treat." Dissent at 108. Frequently, health care decisions (including perhaps Dr. Spear's)—so-called "mixed eligibility and treatment decisions," *Pegram*, 530 U.S. at 229, 120 S.Ct. 2143—now contain elements of both. And the medical element can give rise to "state malpractice actions with HMO defendants," *id.* at 236, 120 S.Ct. 2143, if state law so provides, even if the defendants were simultaneously "determining the scope and coverage of an ERISA–plan contract," dissent at 109.

conduct. We see no reason then to bar as preempted state law malpractice actions that rest on the application of standards for medical decision-making—which are established by states independent of and prior to health benefits contracts—to "a patient's constellation of symptoms," *Pegram*, 530 U.S. at 228, 120 S.Ct. 2143. *Accord Isaac v. Seabury & Smith, Inc.*, 2002 WL 1461710, *6–*8, 2002 U.S. Dist. LEXIS 12413, *19–*28 (S.D.Ind. July 5, 2002) (finding no complete preemption of a medical malpractice action based upon a utilization review decision).

■ Focusing on mixed eligibility and treatment decisions, then, we conclude that § 514 preemption does not obtain with regard to those claims predicated on the violation of a state tort law by a failure to meet a state-law defined standard of care in diagnosing or recommending treatment of a plaintiff "patient's constellation of symptoms," *Pegram*, 530 U.S. at 228, 120 S.Ct. 2143.

*3. The Distinction Between Treating Physicians and Utilization Review Agents.* The district court appeared to distinguish between a tort action based on a pre-certification decision, such as Dr. Spears's decision here, and one based on a contemporaneous treatment decision, such as Dr. Pegram's. *See Cicio*, 208 F.Supp.2d at 293 (distinguishing between Dr. Pegram's decision and an anterior decision about "eligibility for coverage"). In support of this distinction, it might be argued that, in the pre-certification context, the treatment analysis precedes the contract interpretation question such that adjudication of a tort action *necessarily* involves an interpretation of the ERISA contract, which in turn triggers preemption. And it might be further argued that in contemporaneous treatment questions, the contract interpretation question does not play the same intervening role.

But we are not convinced such a distinction can in fact be drawn. *Pegram*, as noted, did not distinguish between the decisions of a treating physician empowered to interpret a benefits contract, and medical administrative decisions executed prior to the delivery of care. Its category of mixed eligibility and treatment decisions consisted of "when-and-how question[s]," including, critically, the question whether "a decision to proceed with [a procedure] would meet the medical necessity requirement that conditions the HMO's obligation to provide *or pay for* that particular procedure." *Pegram*, 530 U.S. at 228–29, 120 S.Ct. 2143 (emphasis added). Even when making decisions about whether to pay for particular procedures, "physicians still must decide what to do in particular cases" on the basis of medical assessments. *Id.* at 229, 120 S.Ct. 2143.

And, "[i]n practical terms, . . . eligibility decisions cannot be untangled from physicians' judgments about reasonable medical treatment," or, at least, the untangling will in many instances be no easy task. *Id.* For instance, some managed care organizations require that utilization review agents "negotiate with the treating physician to achieve conformity" in levels of care provided. Shuren, *supra*, at 746–47. That sort of negotiation is reflected in the correspondence between Drs. Spears and Samuel. While Dr. Samuel initiated negotiations with a detailed description of Mr. Cicio's status, Dr. Spears parried with an assertion of the requested treatment's experimental nature. Dr. Samuel then supplemented his argument with support from the medical literature. In response, Dr. Spears apparently made a patient-specific prescription of appropriate treatment by denying one treatment and authorizing another that Dr. Samuel had not requested. At least on the basis of the material on which we review the grant of the Rule

12(b)(6) motion by the district court, we cannot identify distinct moments at which treatment decisions as distinct from eligibility decisions were made in the course of this negotiation, let alone the sequence of such decisions.

In the *Pegram* context of contemporaneous treatment decisions, too, how to distill the moment of the eligibility determination from the facts is far from obvious. Examining the Supreme Court's description of Dr. Pegram's behavior, we cannot determine whether she (1) thought first about how soon Herdrich needed an ultrasound and then considered whether the plan comprised ultrasound tests in a given medical facility, or (2) considered first which benefits were available, and only then analyzed which one was medically warranted within that constrained range. *See Pegram*, 530 U.S. at 215, 120 S.Ct. 2143. In other words, it is difficult, at best, to determine whether her violation of the standard of medical care was apart from and independent of a determination of benefits, or whether the benefits determination preceded and controlled the medical determination.

In sum, it would likely often be difficult to delve into physicians' minds to examine their decisions, which are frequently executed in very brief time-periods and under tremendous pressures, to determine what part of them is medical and what part is administrative. Nor do we think it likely that significant contract interpretation issues will arise in an ensuing tort action. Assuming *arguendo* that Ms. Cicio were to establish that Dr. Spears's decision violated a state law duty of professional care, we

are hard pressed to see how the defendants could successfully contend—as a defense to the *tort* action—that the *contract* permitted them to violate a state law duty standard of care.[14]

### D. Caveats

■ We underscore the fact that this case comes before us on appeal from the grant of a Rule 12(b)(6) motion to dismiss. We therefore hold only that a set of facts consistent with the allegations contained in the complaint would permit the granting of relief—oddly, in this case, remand to state court for a determination, *inter alia*, of whether the complaint states a cause of action under the law of New York. If Dr. Spears's actions that are the subject of the complaint indeed constituted a medical decision or a mixed medical and eligibility decision, then Ms. Cicio's remaining medical malpractice claims should not be dismissed, but remanded to state court for resolution. *See Giordano v. City of N.Y.*, 274 F.3d 740, 754–55 (2d Cir.2001). It may nonetheless be that, as a matter of fact, Dr. Spears's decision was purely one concerning eligibility, i.e., a determination that, without regard to Mr. Cicio's "constellation of symptoms" but in the abstract, double cell stem transplants were experimental as treatment for multiple myeloma. In that case, the claims would be completely preempted by ERISA and therefore subject to dismissal. We therefore do not rule out the possibility that the defendants can demonstrate, *as a matter of fact*, that dismissal of the complaint is warranted. We leave it to the district

**14.** Certainly, it would be a different matter if the complaint alleged only that the health benefits plan did not cover a given procedure without regard to what symptoms a patient presented. In that case, the defendants would in fact be contending that they made no medical decision that could be subject to state law standards for medical care, but rather only interpreted the contract. In such cases, a court would have to make a threshold determination, as we have done in the case at bar, as to whether a medical decision made by the defendants has been alleged.

court to determine what proceedings, if any, would be appropriate to that end.

Finally, we reiterate that we do not decide under what circumstances, if any, the decisions made by Vytra or Dr. Spears, or utilization review decisions generally, may when negligently made be actionable under New York law. Perhaps they never are. Unless the district court determines that Dr. Spears was in fact making pure eligibility decisions with respect to Mr. Cicio's health care and dismisses the claim on that ground, that will be a question for the New York courts to decide upon remand.

## CONCLUSION

We affirm the district court's disposition of the timeliness and misrepresentation claims, but vacate its resolution of the medical malpractice claims and remand for further proceedings consistent with this opinion.

CALABRESI, Circuit Judge, dissenting in part.

How can one object to the result reached by the court in this case? Taking its inspiration from some words in *Pegram v. Herdrich*, 530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000), the majority elegantly skirts the boundary of ERISA preemption to avoid an outrageous outcome. Appellants allege that Mr. Cicio might well have survived, had not the plan administrator negligently denied coverage for Mr. Cicio's treatment. Under the circumstances, it seems no more than just to allow his widow's suit for malpractice to proceed in state court, as the majority does. And I certainly share in the majority's "skepticism of a line of reasoning that would draw from a 'comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans,' the elimination of protective

standards of professional conduct." *Ante*, at 104 (internal citation removed).

Yet in the end I cannot reconcile the majority's holding with the Supreme Court's precedents and with the structure of ERISA itself, given those precedents. Nor do I believe that the majority opinion somehow "fixes" the problem with the ERISA caselaw. The conclusion that my colleagues have reached today is a band-aid on a gaping wound. It may provide justice to Mrs. Cicio, and I'm glad for that, but the injury that the courts have done to ERISA will not be healed until the Supreme Court reconsiders the existence of consequential damages under the statute, or Congress revisits the law to the same end.

### I.

The country's leading ERISA scholar, John Langbein, has demonstrated that ERISA § 502(a), the civil remedies section, closely tracks the traditional remedies of trust law. *See* John H. Langbein, What ERISA Means by "Equitable": The Supreme Court's Trail of Error in *Russell, Mertens,* and *Great West,* Yale Law & Economics Research Paper No. 269 (Jan. 2003), *available at* www.ssrn.com. Under traditional precepts, an aggrieved trust beneficiary "may recover (1) for loss incurred, (2) for any profits that the trustee made in breach of trust, and (3) for any gains that would have accrued but for the breach," i.e., for consequential damages. *Id.* at 29. Trust beneficiaries may not, however, recover punitive damages. *Id.* at 59. By setting into motion the development of a body of federal trust law to govern benefit plan administration, and by preempting state laws that would add (or subtract) to the relief provided by § 502, the drafters of ERISA nicely "balanc[ed] the need for prompt and fair claims settlement procedures against the public inter-

est in encouraging the formation of employee benefit plans." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 54, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

Or so Congress and ERISA beneficiaries fairly could have hoped. What they got instead was the Supreme Court's "Trail of Error," in which the Court lumped consequential and punitive damages into the misleading category of "extracontractual relief," *see Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 144, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), and disallowed both by dint of an anachronistic (and historically false) law/equity distinction said to be implicit in Congress's provision for "appropriate equitable relief" in § 502(a)(3). *See Mertens v. Hewitt Assocs.,* 508 U.S. 248, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993); *see generally* Langbein, Trail of Error, at 28–75, and especially 62–73. The upshot is that ERISA, despite its ambition, today generally does not "make whole" plan beneficiaries harmed by plan administrators' misconduct. *See ante* at 95, n. 8, and sources there cited.

Not surprisingly, there has developed pressure on ERISA's preemption provisions, so that the states may see to it that plan beneficiaries who under a proper, trust-based reading of § 502(a) would be adequately cared for by ERISA, are otherwise protected ex ante, or compensated ex post, under state law. The Supreme Court's recent holding in *Rush Prudential HMO, Inc. v. Moran,* 536 U.S. 355, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002), and its discursion on "mixed" eligibility and treatment decision in *Pegram,* is evidence of that pressure. But the opportunistic attacks on preemption that may result will serve mainly to complicate ERISA and to create anomalous results. Some deserving plaintiffs will be helped out along the way, but many others will obtain no relief, and providers will increasingly have to face that very patchwork of liability risks—differing from state to state—that ERISA's preemptive scheme was meant to avoid.

Because it is not too late for the Supreme Court to retrace its Trail of Error and start over from the beginning,[1] or for Congress to wipe the slate clean, I decline to join in Part V of the majority's opinion.

## II.

A short dissent is not the place to delve deeply into the mysteries of ERISA preemption law.[2] Suffice it to say that, after a disastrous flirtation with the notion that any cause of action that was in any way connected to an ERISA contract was preempted by ERISA, the law has moved

1. ERISA is a difficult statute, and the Supreme Court has shown admirable flexibility in its approach to the law. *See, e.g., N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) ("[W]e have to recognize that our prior attempt to construe the phrase 'relate to' [in ERISA's express preemption section] does not give us much help drawing the line here.") The Court's willingness to update its initial gloss on ERISA preemption is cause for hope that the Court may yet revisit its disallowance of consequential damages under § 502(a)(3).

2. In particular, I do not deem it worthwhile to get into the vagaries of when express preemption under ERISA dictates a result, and when, additionally, complete preemption requires that the case be heard in federal court. It is enough to note that the arguments I make, if valid, require complete preemption in this case. Specifically, permitting this suit to go forward would mean allowing an "alternative enforcement mechanism" to that provided by ERISA's civil remedies section. *See Plumbing Indus. Bd. Local Union No. 1 v. E.W. Howell Co.,* 126 F.3d 61, 67 (2d Cir. 1997), quoting *N.Y. State Conference of Blue Cross & Blue Shield Plans,* 514 U.S. at 658 (1995).

more and more in the direction of barring only those state actions which, if local law were permitted to govern, would expand (or contract) the relief available beyond that provided by § 502(a) of ERISA. *See Cal. Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc.,* 519 U.S. 316, 334–36, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) (Scalia, *J.,* concurring) (recognizing problems with the Court's early ERISA preemption decisions, and calling for a more open acknowledgment of the evolution that has occurred in the ERISA preemption jurisprudence); *Rush Prudential,* 122 S.Ct. at 2167 ("While independent review under [an Illinois claims-review statute] may well settle the fate of a benefit claim under a particular contract, ... the relief ultimately available[, i.e., coverage of the disputed medical procedure,] would still be what ERISA authorizes in a suit for benefits under [§ 502(a)].").

Even accepting this more limited—and I believe more sensible—scope of preemption, where does that leave Mrs. Cicio's suit? The answer lies in whether the suit, in its essence, is to obtain relief for the violation of rights under the terms of the ERISA plan, in which case the state action is preempted, or whether it is a suit for malpractice against a doctor (or the doctor's employer) as to which the existence of ERISA coverage is only incidental. To put it another way, if ERISA were not there, would this suit essentially be against an insurance provider for negligently failing to give the coverage contracted for, or

would the suit be against a medical care provider for negligent failure to treat? Because I think that the current suit is clearly of the first sort, I regretfully conclude that it is barred.

It is, of course, possible that the insurance provider is also the medical care provider. In such cases, in which propriety of treatment and propriety of judgment as to eligibility under an ERISA plan are intertwined, I do not believe that a state-law malpractice suit would be preempted. Such a state-law action cannot be preempted, simply because the *treatment* decision was made by the same person who made the improper decision as to the *scope of coverage* under an ERISA plan. The fact that the medical malpractice and the contract misinterpretation involved the exact same error does not make the state tort action in any way dependent on a finding that the ERISA contract has been breached. It therefore would not be barred by ERISA.

There may also be situations in which it is unclear whether the plan provider is the medical provider as well (or is that provider's employer). Then too, state law may be free from ERISA preemption in ruling on whether what the plan administrator did constituted medical treatment or, what is the same thing, amounted to an employment of medical care providers. And, if state law so determined, once again a state malpractice suit might lie.[3]

---

**3.** Indeed, a suggestion could even be made that a) where a treating physical fails to attempt to treat simply *because* the plan administrator denied coverage, and b) that denial was ostensibly made on medical grounds, it may be possible for a state to find that the plan administrators *de facto* controlled the treating physician and hence were responsible—as principals—for that doctor's malpractice as agent. This approach would lead to the seeming paradox that recoveries of conse-

quential damages against the plan administrators might be available when the plaintiff's physician foolishly forwent trying to treat after the administrators denied coverage, while such damages would be precluded when that same physician wisely continued to try to treat and stopped only because the moneys needed for treatment were not available. But the paradox is more apparent than real, since it is always the case that a person who suffers a medical maloccurrence after proper medi-

The case before us is, unfortunately, not amenable to any such interpretations. Despite the majority's admirable efforts, the facts, read most favorably to the appellant, are plain. The plan administrators—perhaps because of bad medical judgment, perhaps for other improper reasons—interpreted Mr. Cicio's ERISA-plan contract not to cover the procedure he and his treating physician sought. The treating physician, however, did not give up and in time the plan administrator relented, in part. By then it was too late.

On these facts it seems to me clear beyond peradventure a) that the plan administrators were not, in any way, acting as Mr. Cicio's doctors, b) that what they were doing was—perhaps negligently—determining the scope and coverage of an ERISA-plan contract, c) that as a result of that allegedly improper denial of coverage, Mr. Cicio was financially unable to obtain, in time, the treatment he and his treating physician continued to seek, and d) that catastrophic, consequential damages—Mr. Cicio's death—flowed from the improper misreading of the ERISA-plan coverage. Mrs. Cicio then sued for those damages. If this is not a paradigmatic suit to remedy the violation of rights under the terms of the plan, I don't know what is.

The majority tries to make much of the fact that the coverage decision was erroneously made because of a *medical error* on the plan administrator's part. That may well be, but that fact seems to me irrelevant. Indeed, its irrelevance shows why, at best, the majority opinion only band-aids a gaping wound.

Improperly erroneous coverage decisions by plan administrators can be made for any number of reasons, medical and non-medical. The result of such denials of coverage, as a practical matter, often will be, as it allegedly was in this case, the source of disastrous consequential injuries. The ERISA beneficiary gets no money and as a result suffers grievous consequential harms. Such harms are not, however, remediable injuries under ERISA, given the Supreme Court's misguided decision in *Mertens,* 508 U.S. at 255–62, 113 S.Ct. 2063 (1993) (holding that "appropriate equitable relief" under ERISA § 502(a)(3) does not encompass compensatory damages). And there is no suggestion in the preemption cases that state suits based on the underlying negligence that gave rise to an erroneous coverage decision can survive under ERISA. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (holding preempted a state-law claim based on allegedly improper processing of benefits).

There is none, that is, except for the unexplained comment in *Pegram*—on which the majority puts such weight—dealing with medically based errors. But that well intentioned dicta can only make sense where the underlying negligence also plausibly constitutes medical maltreatment by a party who can be deemed to be a treating physician or such a physician's employer, as was the case in *Pegram.*[4] Where, as here, no such relationship existed, there is no apparent reason, in state or federal law, for treating the unlawful coverage decision any differently from any other unlawful coverage decision that is *not* based on medical error.

In the end, stretching to avoid preemption in order to allow state actions for consequential damages in cases like this one, in which the wrongful coverage deci-

---

cal treatment is worse off—in terms of legal damages—than one whose medical maloccurrence was due to malpractice.

4. *Pegram,* of course, was not a preemption decision.

sion was medically based, will help a few deserving people, like Mrs. Cicio. It will, however, leave unaided all those who suffer identical consequential damages as a result of non-medically based wrongful coverage decisions. And there is nothing in ERISA theory or practice that seems to me to justify such different treatment.

## III.

The majority reaches a result that I believe to be just *in this case*, and I applaud it. Since that result neither fits with the existing structure of ERISA nor—except occasionally and anecdotally—solves the problem caused by the Supreme Court's denial of consequential damages under ERISA, I respectfully dissent from Part V of the majority's opinion.