**Bori NGUYEN and Anh–Dung Nguyen, Plaintiffs,**

v.

**HEALTHGUARD OF LANCASTER, INC., Defendant.**

**No. CIV.03–3106.**

United States District Court, E.D. Pennsylvania.

Aug. 14, 2003.

Order Denying Reconsideration Oct. 7, 2003.

---

7. In any event, the Court will treat novation as an affirmative defense pursuant to Rule 8(c).

Michele S. Eagan, Joseph F. Roda, Roda & Nast, P.C., Lancaster, PA, for Plaintiffs.

Robert M. Frankhouser, Kevin M. French, Hartman, Underhill & Brubaker, LLP, Lancaster, PA, for Defendants.

## MEMORANDUM AND ORDER

VAN ANTWERPEN, District Judge.

Plaintiffs Bori Nguyen and her husband Anh–Dung Nguyen assert claims under

the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, the Pennsylvania Bad Faith Insurance statute, 42 Pa.C.S. § 8371, and Pennsylvania common law actions of medical malpractice and loss of consortium. These claims arise out of Plaintiff Bori Nguyen's dispute with her insurer, defendant Healthguard of Lancaster, Inc. ("Healthguard" or "defendant"), over coverage for major surgery to cure a spinal injury. Defendant now moves to dismiss the plaintiffs' three state law claims on the basis that they are pre-empted by the federal ERISA statute or, in the event we conclude they are not, that the plaintiffs' medical malpractice claim does not state a cause of action because there is no doctor-patient relationship between the parties. For the reasons discussed below, we grant the defendant's motion to dismiss, although plaintiff Bori Nguyen may still proceed on her remaining claim.

## I. STATEMENT OF JURISDICTION

■ We have jurisdiction to hear claims alleging violations of ERISA under our federal question jurisdiction, 28 U.S.C. § 1331. The plaintiffs' state Bad Faith Insurance statute and common law medical malpractice and loss of consortium claims arise out of the same transaction and occurrence, and we exercise our supplemental jurisdiction to hear them under 28 U.S.C. § 1367(a).

## II. STANDARD OF REVIEW

■ Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint in whole or in part "for failure to state a claim upon which relief can be granted." In reviewing a motion to dismiss under Rule 12(b)(6), "all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party." *Sturm v. Clark,* 835 F.2d 1009, 1011 (3d

Cir.1987). A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *D.P. Enterprises v. Bucks County Community College,* 725 F.2d 943, 944 (3d Cir.1984).

## III. FACTUAL BACKGROUND

We briefly summarize the relevant facts in this case, taking the allegations contained in the plaintiffs' complaint and reasonable inferences therefrom as true. *Sturm,* 835 F.2d at 1011.

Plaintiff Bori Nguyen was diagnosed with a bulging disc in her back between the fourth and fifth lumbar vertebrae in June, 2000. She suffered a recurrence of the pain that had led to that diagnosis in April 2002 and sought medical advice. For the next four months, she followed a conservative course of treatment that included physical therapy and epidural steroid injections, but her pain did not go away and, indeed, worsened. Eventually, her pain was sufficient to cause her to walk with a limp, to prevent her from performing routine tasks at home and to interfere with her ability to work.

In September 2002, Mrs. Nguyen's neurosurgeon, Dr. Gastaldo, recommended that she undergo an L4–L5 laminectomy. Mrs. Nguyen sought the opinion of her orthopedic surgeon, her family physician and another, independent, neurosurgeon, who all concurred in Dr. Gastaldo's recommendation. At that point, presumably, Mrs. Nguyen began the process of seeking approval from her insurance company for the procedure.

Mrs. Nguyen is a beneficiary of an employee-funded insurance plan administered by defendant HealthGuard. Her policy provides coverage for "medically necessary services," which are defined as those ser-

vices rendered to an insured for "a condition" that "according to generally accepted principles of good medical practice" requires "the direct care and treatment of an illness or injury," as "ordered or prescribed by a Provider and which are not provided as a matter of convenience."[1]

Healthguard denied Mrs. Nguyen coverage for the operation recommended by Dr. Gastaldo based on a determination that it was not medically necessary. To make this determination, a nurse employed by Healthguard assessed whether Mrs. Nguyen displayed the symptoms Healthguard believes are necessary to justify an L4–L5 laminectomy. The nurse employed a worksheet issued by Interqual that contains criteria for use in judging the medical necessity of this operation; no mention of Interqual criteria is made in the policy under which Mrs. Nguyen is insured. The nurse found that the procedure was not medically necessary because Mrs. Nguyen's symptoms were "mild," the "radiology criteria is [sic] not supportive," and there were "no root compression issues," and therefore denied her request for coverage.

Mrs. Nguyen's orthopedic surgeon, Dr. Dahlgren, then wrote to Healthguard in support of her request for coverage. In response, Healthguard assigned another nurse to re-evaluate Mrs. Nguyen's claim. This nurse also concluded that the operation was not medically necessary.

After this second denial, Mrs. Nguyen's treating family physician, Dr. Wolgemuth, wrote a letter to Healthguard in which he argued that the procedure was medically necessary because Mrs. Nguyen's pain was worsening and already interfered with her ability to function at home and at work. Dr. Wolgemuth also pointed out that the objective findings, including an EMG study, made Mrs. Nguyen a good candidate for surgery. Healthguard's response was to assign yet another nurse to review Mrs. Nguyen's file, who concluded, in similar fashion, that an L4–L5 laminectomy was not medically necessary.

At this point, Dr. Gastaldo wrote a letter to Healthguard in which he argued that Mrs. Nguyen's diagnostic films showed a subtle L4–L5 root deficit on the right, that her back and right leg pain has been increasing, that she had decreased sensation in her right L5 dermatome, and that surgery for her was appropriate especially in light of the failure of conservative treatment methods to resolve her symptoms. Healthguard refused to conduct further review of Mrs. Nguyen's records, but informed Mrs. Nguyen by telephone that she could file a Level I appeal if she continued to disagree with its medical necessity determination.

Mrs. Nguyen duly requested a Level I appeal and sent Healthguard a detailed account of her medical history along with copies of the films from her lumbar myelogram and post-myelogram CT scan. Healthguard never passed these films on to any of the doctors who would later review Mrs. Nguyen's claim.

Healthguard sought the opinion of what it claims was an "independent board-certified surgeon."[2] As noted, Healthguard did not provide this independent reviewer

---

1. These quotations appear in paragraph 11 of the plaintiffs' Complaint. Although we take them as an accurate representation of the contents of Mrs. Nguyen's written insurance policy for purposes of deciding this motion, that policy is not part of the record and we make no final findings with regard to its content.

2. It is not clear whether the plaintiffs challenge Healthguard's account of its procedures following the request for a Level I appeal. However, the plaintiffs may intend to imply some suspicion about the bona fides of the independent reviewer. *See* Complaint, ¶ 29.

with the films supplied by Mrs. Nguyen. Nevertheless, Healthguard denied Mrs. Nguyen's claim on the basis that the procedure is not medically necessary because "of the lack of imaging studies showing nerve root compression." Compliant, ¶ 29.

Mrs. Nguyen requested a Level II appeal, and Healthguard scheduled the required hearing. Prior to this hearing, the defendant obtained the opinion of another independent surgeon. As with the first independent reviewer, Healthguard did not provide this reviewer with Mrs. Nguyen's diagnostic films. This reviewer reached the same conclusion as the first, that the surgery is not medically necessary.

Five days before the hearing, Mrs. Nguyen requested that the defendant reschedule the hearing because her treating neurosurgeon, Dr. Gastaldo, would not be able to attend on the date originally set. Healthguard told her that the hearing would be rescheduled, but, three days later, called her to tell her it would not reschedule the hearing, but rather that it would occur the next day at a different time than originally set whether anyone attended on her behalf or not.

Mrs. Nguyen and her husband attended the rescheduled hearing without any of her physicians. They took with them copies of her diagnostic films. At the hearing, the defendant's medical director, Dr. Robert Grossman, M.D., said that Healthguard uses InterQual criteria to determine whether a given treatment is medically necessary for a given patient, that Mrs. Nguyen did not meet the InterQual criteria for an L4–L5 laminectomy because she did not have nerve root compression, and that the results of Mrs. Nguyen's EMG study were not sufficient to approve surgery. It was after this testimony that Mrs. Nguyen discovered that not a single person who had reviewed her claim for coverage had been supplied with the diagnostic films she had provided to the defen-

dant. When she asked Dr. Grossman to explain this, he claimed that she had never submitted any diagnostic films. After the hearing, however, Healthguard asked one of its independent reviewers to review the films that it had earlier failed to provide. This doctor then reiterated his earlier conclusion, saying that "the proposed procedure did not meet the criteria and that there were no indications of overriding medical necessity."

Mrs. Nguyen sought further support for her claim from a third neurosurgeon, Dr. Sheehan, and he concluded that an L4–L5 laminectomy is "perfectly reasonable," that nerve root compression is the "most likely cause" of Mrs. Nguyen's pain, and that it is "certainly worth micro-decompression." Mrs. Nguyen then requested an external appeal from Healthguard and submitted further documentation in support of her request including Dr. Sheehan's report.

Although Healthguard granted Mrs. Nguyen's request for an external appeal, it did not forward either Dr. Sheehan's report or Mrs. Nguyen's myclogram film to the external review service. This service, Maximus, found that the proposed surgery was "not medically reasonable and necessary" because "there was no evidence in the case file documentation of radiculopathy involving the spinal root." Mrs. Nguyen's demand to know why Healthguard had again failed to forward crucial documentation to its reviewer was met by Healthguard's decision to send Dr. Sheehan's report and her myelogram film to Maximus for another opinion. Despite the new information, Maximus again found that the procedure was not medically necessary.

Mrs. Nguyen has been unable to work due to her serious and constant back pain, which radiates down her right leg to her foot, while Mr. Nguyen alleges that he has been deprived of the care, comfort, society and services of his wife due to her injury.

They filed this action on May 15, 2003. Count I alleges that Healthguard improperly denied the benefit of coverage for Mrs. Nguyen's L4–L5 laminectomy, in violation of ERISA. Count two asserts a claim under the Pennsylvania Bad Faith Insurance statute, alleging that, *inter alia,* Healthguard's application of criteria other than "generally accepted principles of good medical practice" and its failure to provide its medical reviewers with copies of Mrs. Nguyen's diagnostic films breached its duty of utmost good faith. In Counts III and IV, the Nguyens allege that Healthguard breached its common law duty to provide non-negligent medical care and that Mr. Nguyen has suffered a loss of consortium with his wife as a result.

Defendant now moves to dismiss Counts II, III and IV primarily on the basis that the federal ERISA statute pre-empts state law causes of action. In the alternative, Healthguard argues that it has no doctor-patient relationship with Mrs. Nguyen that would support the medical malpractice claim asserted in Count III and Mr. Nguyen's loss of consortium claim in Count IV, as a derivative claim, must also be dismissed.

Before us is the Defendant's Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6), filed July 18, 2003, and brief in support thereof, and the plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss Pursuant to Fed.R.Civ. P.12(b)(6), filed August 1, 2003. For the reasons that follow, we grant the defendant's motion.

## IV. DISCUSSION

### A. Bad Faith Insurance Statute

For at least seven decades, a bedrock of Pennsylvania insurance law has been that insurers owe a duty of "utmost good faith"

towards its insureds. *See Romano v. Nationwide Mut. Fire Ins. Co.,* 435 Pa.Super. 545, 646 A.2d 1228, 1231 (1994); *Dercoli v. Pennsylvania Nat'l Mut. Ins. Co.,* 520 Pa. 471, 554 A.2d 906 (1989); *Cowden v. Aetna Cas. & Sur. Co.,* 389 Pa. 459, 134 A.2d 223 (1957); *Fedas v. Ins. Co. of Pa.,* 300 Pa. 555, 151 A. 285, 286 (Pa.1930). This common law duty of care did not provide an independent cause of action, however, *Terletsky v. Prudential Property and Cas. Ins. Co.,* 437 Pa.Super. 108, 649 A.2d 680 (1994), until the legislature enacted the Bad Faith Insurance statute, 42 Pa.C.S.A. § 8371. This statute provides that, in an action arising from an insurance policy, if the court finds that the insurer has acted in bad faith, it may award any or all of 1) prejudgment interest of prime plus three percent, 2) punitive damages or 3) court costs and attorney fees charged to the defendant. 42 Pa.C.S.A. § 8371. It is under this statute that Mrs. Nguyen seeks prejudgment interest and punitive damages.

The defendant moves to dismiss Mrs. Nguyen's Bad Faith Insurance statute claim on the basis that is pre-empted both by ERISA's explicit pre-emption clause, ERISA Section 514, 29 U.S.C. § 1144(a), and under the judicial doctrine of complete pre-emption based on the exclusive nature of the remedies provided by Congress in ERISA Section 502, 29 U.S.C. § 1132(a)(1)(B). For the reasons discussed below, we find that Mrs. Nguyen's Bad Faith Insurance statute claim is pre-empted under both Section 514 and Section 502.

#### 1. Section 514 Pre-emption

Section 514 of ERISA provides that the act "shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan."[3]

---

**3.** Certain employee benefit plans are exempted from coverage under ERISA and state laws that relate to those plans are not pre-empted. 29 U.S.C. §§ 1003(b), 1144(a).

There is a savings provision, however, which excepts from pre-emption "any law of any state which regulates insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A).[4] The question before us is whether the Pennsylvania Bad Faith Insurance statute "regulates insurance" within the meaning of the savings provision.

■ The Supreme Court has developed a two-part test for deciding whether a state law regulates insurance. First, a state law must be "specifically directed toward" the insurance industry to fall within ERISA's savings clause. *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 50, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Second, because "not all laws 'specifically directed toward' the insurance industry will be covered by § 1144(b)(2)(A), which saves laws that regulate *insurance* and not *insurers,"* a state law must also regulate insurers "with respect to their insurance practices." *Kentucky Ass'n of Health Plans, Inc. v. Miller,* 538 U.S. 329, 123 S.Ct. 1471, 1475, 155 L.Ed.2d 468 (2003) (citing *Rush Prudential HMO, Inc. v. Moran,* 536 U.S. 355, 366, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002)).

The defendant does not dispute that the Pennsylvania Bad Faith insurance statute is specifically directed toward the insurance industry. Def. Mem. at 16. It is clear that the first part of the test is satisfied, and we move to examining whether the statute regulates insurers "with respect to their insurance practices." *Miller,* 123 S.Ct. at 1475.

Until the Supreme Court's decision in *Miller,* the Court had applied a three-factor test derived from case law interpreting the McCarran–Ferguson Act, 14 U.S.C. § 1011 *et seq.,* in order to deter-

mine whether a state law regulates insurers' insurance practices. *Id.,* 123 S.Ct. at 1478. These factors were 1) whether the regulation has the effect of transferring or spreading a policyholder's risk; 2) whether the practice regulated is an integral part of the policy relationship between the insurer and its insureds; and 3) whether the practice regulated is limited to entities operating in the insurance industry. *Pilot Life,* 481 U.S. at 48–48, 107 S.Ct. 1549 (citing *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982)). It was not necessary that a state law satisfy all three factors. *UNUM Life Ins. Co. of America v. Ward,* 526 U.S. 358, 374, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999). Applying the McCarran–Ferguson factors, the Court has saved from pre-emption an Illinois law requiring HMOs to provide independent review of whether services are medically necessary, *Rush Prudential,* 536 U.S. at 372, 122 S.Ct. 2151, a California law requiring an insurer to demonstrate prejudice in order to deny an untimely claim for benefits, *UNUM,* 526 U.S. 358, 119 S.Ct. 1380, and a Massachusetts law that requires certain minimum mental health services be covered under any health insurance policy issued in that state, *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 742–47, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). It did so even though it declined to consider, in both *Rush Prudential* and *UNUM,* whether the state law at issue satisfied the first McCarran–Ferguson factor. *Rush Prudential,* 536 U.S. at 373–74, 122 S.Ct. 2151; *UNUM,* 526 U.S. at 374, 119 S.Ct. 1380. In contrast, in *Pilot Life,* the Court found that the Mississippi common law action for bad faith in business dealings did not regulate insurance both because it was not

---

4. A state law that on its face purports to "regulate insurance" in order to come within the protection of the savings provision "cannot deem an employee benefit plan to be an insurance company." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); 29 U.S.C. § 1144(b)(2)(B).

specifically directed towards insurance and because it did not "effect a spreading of policyholder risk". 481 U.S. at 49–52, 107 S.Ct. 1549.

■ In *Miller*, however, the Supreme Court abandoned the McCarran–Ferguson factors as a method of determining whether a state law regulates insurers "with respect to their insurance practices" for purposes of the savings clause contained in Section 514 of ERISA. 123 S.Ct. at 1478–79.[5] Instead of even asking this question, the second prong of the test for whether a state law regulates insurance within the meaning of Section 514's savings clause is that it "must substantially affect the risk pooling arrangement between the insurer and the insured." *Id.*, 123 S.Ct. at 1479. In making this "clean break" with the past, *Id.*, the Court characterized its prior rulings in *Metropolitan Life, UNUM*, and *Rush Prudential* as being consistent with the new standard announced. It did so despite the fact that, as noted, in both *Rush Prudential* and *UNUM*, the Court had declined to make a finding with regard to whether the laws in question satisfied the first McCarran–Ferguson prong, i.e. whether they had "the effect of transferring or spreading the policyholder's risk." *Rush Prudential*, 536 U.S. at 373–74, 122 S.Ct. 2151; *UNUM*, 526 U.S. at 374, 119 S.Ct. 1380. Indeed, in both cases, the court implied that the state laws under review did not satisfy the first McCarran–Ferguson factor. *See Rush Prudential* 536 U.S. at 373–74, 122 S.Ct. 2151; *UNUM*, 526 U.S. at 374, 119 S.Ct. 1380. Nevertheless, it appears that the Court did not intend to overrule its earlier decisions in these cases, and we take them as binding precedent although we recognize that their value is limited, in as much as the Court specifically noted the lack of parity

between the old first McCarran–Ferguson factor and the new standard announced in *Miller*. *Miller*, 123 S.Ct. at 1477 n. 3 (contrasting the first McCarran–Ferguson factor with the new standard and noting that "our test requires only that the state law substantially *affect* the risk pooling arrangement between the insurer and the insured; it does not require that the state law actually spread risk.").

We view the Court's opinion in *Pilot Life* in the same light, and that case bears similarity to the one at hand. In it, the Court considered a Mississippi common law action for bad faith that provides for punitive damages in any case in which the court finds that one party to a contract acted in bad faith when it breached that contract. *Pilot Life*, 481 U.S. at 49–50, 107 S.Ct. 1549. The Court found, first, that the law was not specifically directed toward the business of insurance because it was generally applicable to all contracts, whether insurance-related or not. *Id.* at 50, 107 S.Ct. 1549. In addition, as relevant to this case, the Court found that it did not satisfy the first McCarran–Ferguson factor in that it did not "effect a spreading of policy-holder risk." *Id.* at 50, 107 S.Ct. 1549. As the Court explained, "In contrast to the mandated-benefits law in *Metropolitan Life*, the common law of bad faith does not define the terms of the relationship between the insurer and the insured; it declares only that, whatever terms have been agreed upon in the insurance contract, a breach of that contract may in certain circumstances allow the policyholder to obtain punitive damages." *Id.* at 51, 107 S.Ct. 1549.

We recognize that the old McCarran–Ferguson factor of whether the law at issue "has the effect of transferring or

---

**5.** *Miller* retained the first part of the test developed in earlier cases for determining whether a state law regulates insurance, i.e.

the question whether the law is specifically directed toward the insurance industry. 123 S.Ct. at 1475, 1479.

spreading a policy holder's risk," *UNUM*, 526 U.S. at 367, 119 S.Ct. 1380, is not identical to the new test announced in *Miller*, whether the law "substantially affect the risk pooling arrangement between the insurer and the insured." 123 S.Ct. at 1479. *Miller*, 123 S.Ct. at 1477 n. 3. Nevertheless, we believe that the Supreme Court's holding in *Pilot Life* is instructive here. The Pennsylvania Bad Faith insurance statute does not define the terms of the relationship between the insurer and its insureds. It does not add a policy term in the way that the Illinois independent review provision approved in *Rush Prudential* could be said to do.[6] Like the Mississippi common law bad faith action, it "declares only that, whatever terms have been agreed upon in the insurance contract, a breach of that contract may in certain circumstances allow the policyholder to obtain punitive damages." *See Pilot Life*, 481 U.S. at 51, 107 S.Ct. 1549. We do not believe, however, that *Pilot Life* is dispositive of the issue because the standard it applied is, as we have noted, different from that announced in *Miller*. *But cf. McGuigan v. Reliance Standard Life Ins. Co.*, 256 F.Supp.2d 345, 348 (E.D.Pa.2003) (relying on *Pilot Life* and adopting its reasoning to find that the Pennsylvania Bad Faith Insurance statute is pre-empted under ERISA).

The Supreme Court's decision in *Miller* does not provide much guidance in construing the meaning of the test it announces. Although the Court noted that "a state law requiring all insurance companies to pay their janitors twice the minimum wage would not 'regulate insurance'," the Court's reason was merely "because it does not substantially affect the risk pooling arrangement undertaken by the insurer and insured." *Miller*, 123 S.Ct. at 1477.

We can, however, glean some meaning from the Court's next exposition, discussing the Kentucky law at issue in the case, which requires health benefit plans to enroll "any willing provider" in their coverage plans. The court found that such "any willing provider" laws "alter the scope of permissible bargains between insurers and insureds in a manner similar to the mandated-benefits laws we upheld in *Metropolitan Life*, the notice-prejudice rule we sustained in *UNUM*, and the independent-review provisions we approved in *Rush Prudential*." *Miller*, 123 S.Ct. at 1477–78. Thus, we believe that if a state law alters "the scope of permissible bargains between insurers and insureds," it "substantially affects the risk-pooling arrangement."

 The plaintiffs argue that "risk pooling" is synonomous with "insurance," and that therefore we need only ask whether the law "is aimed at insurance." Pl. Mem. at 10. It is difficult to see how this proposed test would be any easier to apply than the statutory language, which saves

---

6. In the context of the second McCarran–Ferguson factor, the Supreme Court found that the Illinois independent review provision affected the policy relationship between the insurer and its covered beneficiaries "by translating the relationship under the HMO agreement into concrete terms of specific obligation or freedom from duty." 536 U.S. at 374, 122 S.Ct. 2151. Although this reasoning is not directly applicable to the first McCarran–Ferguson factor (or, by inference, to the new standard announced in *Miller*), the Court also noted that a suit to compel compliance with a state law that essentially alters the terms of a policy could be viewed either as a suit to compel compliance with the terms of a benefits plan or as one to recover benefits due. *Id.* at 363 n. 2, 122 S.Ct. 2151. The Pennsylvania Bad Faith Insurance statute does not "translate the relationship" between insurers and their insureds "into concrete terms of specific obligation," and could not form the basis of a suit to compel compliance with the terms of a policy or to recover benefits due. We believe this underscores our finding that the statute does not affect the risk-pooling arrangement between insurance companies and their insured beneficiaries.

laws that "regulate insurance," and which the Supreme Court's decisions are meant to clarify. In addition, the plaintiff's proposed language appears to be no different from the first prong of the test of whether a state law regulates insurance, retained in *Miller*, of whether the law is "specifically directed towards the insurance industry." 123 S.Ct. at 1475, 1479. Neither party disputes that the Pennsylvania Bad Faith Insurance statute is directed towards the insurance industry. We think it would be farcical to try to answer the question whether a law "regulates insurers" by asking whether it "regulates insurance." Instead, we will apply the Supreme Court's formulation as is, taking into account its inherent opacity, and determine whether the Pennsylvania Bad Faith Insurance statute "substantially affects the risk pooling arrangement between the insurer and the insured." *Miller*, 123 S.Ct. at 1479.

We believe that Pennsylvania's Bad Faith Insurance statute is more similar to the minimum pay for janitors example the Supreme Court found would not satisfy the *Miller* test than it is to the state law the court found would satisfy it in *Miller*, or to the three laws upheld in cases the Court stated were consistent with its *Miller* holding: *Metropolitan Life, UNUM* and *Rush Prudential*. Unlike those laws, and more like the minimum pay for janitors example, the Pennsylvania Bad Faith Insurance statute does not affect the kinds of bargains that insurers and insureds may make. It merely says that, whatever the bargain struck, if it is breached in bad faith by the insurer, the insured may recover punitive damages. The remedy of punitive damages for bad faith bears no relation to the risk insured against, just as requiring some minimum pay for janitors bears no relation to the risk insured against, even though both may raise the premiums insureds must pay for their coverage. Neither law affects the risk-pooling arrangement between an insurer and its insureds. We therefore find that the Pennsylvania Bad Faith Insurance statute is not a law that "regulates insurance" within the meaning of the savings provision of ERISA section 514 and is therefore pre-empted.[7]

### 2. Section 502 Complete Pre-emption

■ The civil remedies provided in Section 502 of ERISA are an " 'interlocking, interrelated, and interdependent remedial scheme' ... 'represent[ing] a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans.' " *Rush Prudential*, 536 U.S. at 376, 122 S.Ct. 2151 (*citing Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) and *Pilot Life*, 481

---

**7.** It appears that nearly every other federal district judge in Pennsylvania to have considered the question before *Miller* reached the same conclusion. *E.g., Snook v. Penn State Geisinger Health Plan*, 241 F.Supp.2d 485, 489 (M.D.Pa.2003) (collecting cases); *Sopak v. Highmark, Inc.*, No. 01–1750, 2002 WL 1271366, at *7 (collecting cases) (W.D.Pa. Feb. 19, 2002); *Tutolo v. Independence Blue Cross*, No. 98–5928, 1999 WL 274975, *2–*3, 1999 U.S. Dist. LEXIS 6335, *7–*8 (E.D.Pa. May 6, 1999) (collecting cases); *Garner v. Capital Blue Cross*, 859 F.Supp. 145, 148–49 (M.D.Pa.1994) *aff'd* 52 F.3d 314 (3d Cir. 1995); *Rallis v. Trans World Music Corp.*, No.

93–6100, 1994 WL 96264, at *4 (E.D.Pa. March 25, 1994) (collecting cases). The only contrary decision prior to *Miller* that we are aware of, by Judge Newcomer, agreed with the others in finding that the Pennsylvania Bad Faith Insurance statute did not satisfy the first McCarran–Ferguson factor which, as we have noted, is similar to the new *Miller* test. *Rosenbaum v. Unum Life Ins. Co.*, No. 01–6758, 2002 WL 1769899, at *2 (E.D.Pa. Jul.29, 2003). The only other relevant decision in this district after *Miller* is in accord with our conclusion, though, as we have noted, it adopts in whole the reasoning of *Pilot Life. McGuigan*, 256 F.Supp.2d at 348.

U.S. at 46, 107 S.Ct. 1549). Indeed, Section 502's civil enforcement provisions are the "sort of overpowering federal policy" that is so strong that it even "overrides a statutory provision designed to save state law from being preempted." *Id.* at 375, 122 S.Ct. 2151. Section 502 therefore preempts any state law that provides a remedy different from or in addition to those enumerated by Congress, even if that state law "regulates insurance" and would otherwise fall under the protection of the savings clause in Section 514. *Id.* at 375–80, 107 S.Ct. 1676.

■ If "ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA," such as the punitive damages remedy provided by the Mississippi common law of bad faith and the Pennsylvania Bad Faith Insurance statute, "the policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined." *Pilot Life*, 481 U.S. at 54, 107 S.Ct. 1549. We believe the Supreme Court's reasoning in *Pilot Life*, though characterized as dictum in *Rush Prudential, see* 536 U.S. at 377–78, 122 S.Ct. 2151, squarely applies to this case. We therefore find that the Pennsylvania Bad Faith Insurance statute is completely pre-empted by Section 502 of ERISA because it provides a remedy not contemplated by Congress.[8] *Sprecher v. Aetna U.S. Healthcare, Inc.,* No 02–00580, 2002 WL 1917711, at *7 (E.D.Pa. Aug.19, 2002); *Kirkhuff v. Lincoln Technical Inst., Inc.,*

221 F.Supp.2d 572, 576 (E.D.Pa.2002); *Snook v. Penn State Geisinger Health Plan,* 241 F.Supp.2d 485, 492–93 (M.D.Pa. 2003); *Emil v. UNUM Life Ins. Co. of America,* No. 02–2019, 2003 WL 256781, at *3 (M.D.Pa.2003).[9]

## B. Medical Malpractice

■ In order to establish a medical malpractice claim, a plaintiff must allege that (1) the physician owed a duty to the patient; (2) the physician breached that duty; (3) the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and (4) the damages suffered by the patient were a direct result of the harm. *Rauch v. Mike–Mayer,* 783 A.2d 815, 824 (Pa.Super.2001). The defendant puts forward two arguments in support of dismissing this claim. First, it asserts that there is no doctor-patient relationship between its physicians and Mrs. Nguyen that would give rise to a duty of care that it could have breached. Second, it argues that Mrs. Nguyen's medical malpractice claim is pre-empted by ERISA. Because both of these arguments revolve around the central question of how to characterize the decisions to deny coverage for an L4–L5 laminectomy, we will address both issues together.

■ The Supreme Court has defined three different kinds of decisions a health care plan administrator may make with regard to benefits determinations: (1) eligibility determinations, which are pure ad-

---

8. The plaintiffs argue that "complete pre-emption applies only if (1) the cause of action is based on a state law that conflicts with ERISA and (2) the cause of action is 'within the scope of the civil enforcement provisions.'" Pl. Mem. 19. They ignore, however, pre-emption of laws that provide remedies beyond those allowed by Congress. *Rush Prudential,* 536 U.S. at 375–77, 122 S.Ct. 2151.

9. Both parties cite Judge Newcomer's decision in *Rosenbaum v. Unum Life Ins. Co. of America,* No. 01–6758, 2002 WL 1769899 (E.D.Pa.2002), as contrary authority. However, Judge Newcomer did not address complete pre-emption under Section 502, but rather considered only whether the Pennsylvania Bad Faith Insurance statute is pre-empted by Section 514.

ministrative determinations of whether an insured's particular policy covers the condition or procedure for which coverage is sought; (2) treatment decisions or choices about how to treat or diagnose an insured's condition; and (3) mixed eligibility and treatment decisions, typified as "when and how" decisions that may involve choices about the relative merits of one course of treatment over another. *Pegram v. Herdrich*, 530 U.S. 211, 228–29, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). *Pegram* was not an ERISA pre-emption case, though its reasoning is instructive.

 Two ERISA pre-emption cases from the Third Circuit provide further guidance. Under *Dukes v. U.S. Healthcare, Inc.*, 57 F.3d 350 (3d Cir.1995) and *In re U.S. Healthcare*, 193 F.3d 151 (3d Cir. 1999), state law claims that attack the mere quantity of benefits, i.e. claims directed at administrative decisions, are pre-empted, but claims that attack the quality of benefits are not. 57 F.3d at 356, 193 F.3d at 161–62. Applying *Pegram's* reasoning to these precedents, claims that attack pure eligibility decisions are pre-empted while those that attack either pure treatment or mixed eligibility and treatment decisions are not pre-empted. The question, therefore, is whether the decision not to cover an L4–L5 laminectomy is best characterized as pure eligibility, pure treatment or mixed eligibility and treatment.

 The plaintiffs argue, in essence, that because Healthguard made a decision that an L4–L5 laminectomy is not "medically necessary" and because it did so on the basis of a determination that Mrs. Nguyen does not demonstrate symptomology that her physicians claim she does, their decision to deny coverage was a mixed eligibility and treatment decision. We disagree.

First, a mixed eligibility and treatment decision is usually a "when and where"

decision. As the Supreme Court described these decisions, "physicians ... must decide what to do in particular cases. The issue may be, say, whether one treatment option is so superior to another under the circumstances, and needed so promptly, that a decision to proceed with it would meet the medical necessity requirement that conditions the HMO's obligation to provide or pay for that particular procedure at that time in that case." *Pegram*, 530 U.S. at 229, 120 S.Ct. 2143. All of the cases presented by both parties in their briefs deal with HMOs, which provide both insurance and direct medical services. These arrangements place physicians in a unique position of making both eligibility and treatment decisions. 530 U.S. at 220–21, 120 S.Ct. 2143. Thus, in *Pegram*, the issue was whether the physician/HMO-owner had her own interests in mind when she decided that her patient could wait eight days for an ultrasound in order to avoid paying for her admission to a hospital immediately, when that patient in fact had appendicitis and the delay caused her appendix to rupture. 530 U.S. at 215, 120 S.Ct. 2143. The Court found that, because the doctor in question owned and was employed by the HMO, the HMO itself had made a medical, rather than a fiduciary, decision. *Id.* at 229–30, 120 S.Ct. 2143.

Similarly, in *Pappas v. Asbel*, 564 Pa. 407, 768 A.2d 1089 (2001), the Pennsylvania Supreme Court held that a third-party negligence claim by a defendant hospital against the plaintiff-patient's HMO arising from its refusal to authorize a transfer to a particular hospital while authorizing transfer to other hospitals was a "mixed eligibility and treatment decision" that was not pre-empted by ERISA. As the court emphasized in its opinion, however, the HMO physician-reviewer involved in that case made a decision not only about whether the referral to a non-HMO hospital should be granted, but specifically approved re-

ferrals to other facilities—exactly the kind of "when and where" decision described in *Pegram* as being a mixed eligibility and treatment decision. The cases cited by the plaintiffs in support of their position also for the most part involve decisions by insurers to cover one course of action rather than another. *E.g., Berger v. Livengrin Foundation*, No. 00–501, 2000 WL 325957 (E.D.Pa. Mar.27, 2000) (considering HMO defendant's failure to recommend in-patient alcohol treatment and concomitant decision to place plaintiff in outpatient program instead.) Healthguard has not made a "when and where" decision. It has merely declined to cover this particular surgery.

Second, to the extent the cases cited by the plaintiffs involve decisions simply not to provide certain services, we believe the distinction between HMOs and other kinds of insurers is critical. As we have noted, physicians employed by HMOs must play the dual role of determining whether a given service is consistent with internal cost-containment plans and of determining whether a patient is in need of that service. Without exception, all of the cases cited by plaintiffs considered the actions of physicians in the employ of HMOs. *Pegram*, 530 U.S. 211, 120 S.Ct. 2143; *Dukes*, 57 F.3d 350; *In re U.S. Healthcare*, 193 F.3d 151; *Berger*, 2000 WL 325957; *Lazorko v. Pennsylvania Hosp.*, 237 F.3d 242 (3d Cir.2000). Here, there is no allegation that Healthguard is both providing medical services and making eligibility determinations. That is to say, Mrs. Nguyen's treating physicians are not also the physicians making the determination of whether to perform the L4–L5 laminectomy. Her case is therefore distinguishable from those cited by the plaintiffs.

Moreover, under Third Circuit precedent, it is clear that Mrs. Nguyen is challenging the quantity of benefits she has received and not the quality of those bene-

fits. *Dukes* 57 F.3d at 356. She simply has not received a benefit to which she believes she is entitled. The fact that she has not received that benefit may have decreased her quality of life, and may have led her to seek a lower quality course of treatment than an L4–L5 laminectomy would provide, but Healthguard has not provided her a lower quality course of treatment. It has simply denied her coverage. In essence, Mrs. Nguyen challenges the quality of the Healthguard's decisions, but does not challenge the quality of the benefits she received. Her claim is therefore pre-empted.

Finally, the plaintiffs make much of a recent Second Circuit opinion that holds that attacks on "utilization review" procedures (similar to the medical necessity review procedure employed by Healthguard, though involving third parties) are not pre-empted by ERISA. *Cicio v. Does 1–8*, 321 F.3d 83 (2d Cir.2003). We note that this opinion is not binding precedent upon us. We also note, as the Second Circuit did, that there is a split among the United States Circuit Courts of Appeal on this very issue, and that the Fifth, Sixth and Seventh Circuits disagree with the Second. *Cicio*, 321 F.3d at 100 (*citing, inter alia, Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482 (7th Cir.1996)). The Second Circuit noted, furthermore, that its analytical framework differs significantly from that of the Third. *Id.* at 103 (distinguishing from *Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266 (3d Cir.2001)). Indeed, the Third Circuit in *Pryzbowski* noted that

a claim alleging that an HMO declined to approve certain requested medical services or treatment on the ground that they were not covered under the plan would manifestly be one regarding the proper administration of benefits. Such a claim, no matter how couched, is completely preempted and removable on that basis. *See Dukes*, 57 F.3d at 356

(noting that a claim that the plans erroneously withheld benefits due would be completely preempted); *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1488–89 (7th Cir.1996) (holding that a claim against an HMO's utilization review decision was completely preempted by ERISA).

245 F.3d at 273

This language may be dicta, because it was not dispositive of the outcome of the case, but we believe that the Third Circuit would conclude that a challenge to a medical necessity determination on grounds of malpractice, especially when that determination is made by a non-treating physician outside the context of an HMO, is completely pre-empted by ERISA.

 We think, moreover, that the plaintiffs have not established the necessary physician-patient relationship between the nurses and doctors whom Healthguard employed to make the medical necessity determination and Mrs. Nguyen. They have never taken Mrs. Nguyen on as a patient and they owe her no particular duty of care. They do owe a duty of care to Healthguard, of course, to make their medical necessity determinations in conformity with their employment contract, Healthguard's policies and the rules of medical ethics (i.e., "according to generally accepted principles of good medical practice," as plaintiffs allege). That is not to say that Healthguard does not owe a duty of care to Mrs. Nguyen, although the issue the contours of that duty is not before us at this time.

We therefore dismiss Mrs. Nguyen's medical malpractice claim.

## C. Loss of Consortium

 The parties agree that Mr. Nguyen's loss of consortium claim is derivative of Mrs. Nguyen's medical malpractice claim. Because we have dismissed the latter, we also dismiss the former. Mr.

Nguyen is therefore no longer a party to this action, and he is dismissed as a party from the case.

## V. CONCLUSION

Mrs. Nguyen's claim under the Pennsylvania Bad Faith Insurance statute is preempted under both Section 502 and Section 514 of ERISA. Her medical malpractice claim is pre-empted and, in addition, she has not established that the physicians and nurses who made the decision she attacks owed her a duty of care. Finally, Mr. Nguyen's loss of consortium claim is dismissed and he is dismissed as a party. Plaintiff Bori Nguyen may proceed on her remaining claim. An appropriate order follows.

## *ORDER*

AND NOW, this 14th day of August, 2003, upon consideration of the Defendant's Motion to Dismiss Pursuant to Fed. R.Civ.P. 12(b)(6), filed July 18, 2003, and brief in support thereof, and the plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss Pursuant to Fed.R.Civ.P.12(b)(6), filed August 1, 2003, it is hereby ORDERED that:

1. The Defendant's Motion is GRANTED.
2. Counts II, III and IV of the plaintiffs' complaint are DISMISSED.
3. Plaintiff Mr. Anh–Dung Nguyen is DISMISSED as a party.
4. Plaintiff Bori Nguyen may proceed on her remaining claim under ERISA in Count I.
5. Defendant shall file an answer to the plaintiff's remaining claim within twenty-one (21) days of the date of this order.

## *ORDER ON RECONSIDERATION*

AND NOW, this 7th day of October, 2003, upon consideration of Plaintiff's Mo-

tion for Reconsideration of the Order of August 18, 2003, filed September 15, 2003, and Defendant's Response In Opposition to Plaintiff's Motion For Reconsideration, filed September 25, 2003, it is hereby ORDERED that Plaintiff's Motion is DENIED.[1]

1. We have carefully reviewed both our Memorandum dated August 14, 2003 and Judge Newcomer's insightful opinion in *Rosenbaum v. Unum Life Insurance Co.*, No. 01–56758, 2003 WL 22078557 (E.D.Pa. Sept. 8, 2003). We find that the rationales espoused by our esteemed colleague to support his holding that 42 Pa.C.S. § 8371 survives express preemption by ERISA under that statute's saving clause ultimately unpersuasive. For the reasons explained in our prior Memorandum, we continue to believe that Pennsylvania's statutory punitive damages remedy for an insurer's bad-faith denial of an insurance claim does not *"substantially affect* the risk-pooling arrangement" between an insurer and its insureds in the manner contemplated by the Supreme Court in *Kentucky Ass'n of Health Plans, Inc. v. Miller*, — U.S. —, 123 S.Ct. 1471, 155 L.Ed.2d 468 (2003). Even if we held otherwise, we respectfully disagree with the thoughtful analysis Judge Newcomer used to substantiate his second conclusion that ERISA fails to impliedly preempt § 8371 for the simple reason that we are bound by Supreme Court jurisprudence, even if flawed. The Supreme Court has never wavered in its assertion that Congress did not intend to authorize remedies other than those provided under § 502(a) of ERISA. Years of Supreme Court caselaw has repeatedly emphasized the "overpowering" federal policy in ERISA's civil enforcement provisions. *See, e.g., Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987); *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). This caselaw culminated in a clear reaffirmation by both the majority and dissent in *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002), that Congress intended the remedies under § 502(1) to be exclusive of any state law remedies, regardless of whether the state law at issue "regulates insurance" and is thus "saved" from express preemption under ERISA's saving clause.